# QUERN, DIRECTOR, DEPARTMENT OF PUBLIC AID OF ILLINOIS v. JORDAN

No. 77–841.   Argued November 8, 1978—Decided March 5, 1979

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. BRENNAN, J., filed an opinion concurring in the judgment, in Parts I, II, and III of which MARSHALL, J., joined, *post*, p. 349. MARSHALL, J., filed an opinion concurring in the judgment, *post*, p. 366.

*William A. Wenzel III,* Special Assistant Attorney General of Illinois, argued the cause for petitioner. With him on the briefs was *William J. Scott,* Attorney General.

*Sheldon Roodman* argued the cause for respondent. With him on the brief was *James D. Weill.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

This case is a sequel to *Edelman* v. *Jordan,* 415 U. S. 651 (1974), which we decided five Terms ago. In *Edelman* we held that retroactive welfare benefits awarded by a Federal District Court to plaintiffs, by reason of wrongful denial of benefits by state officials prior to the entry of the court's order determining the wrongfulness of their actions, violated the

---

**Theodore L. Sendak,* Attorney General, *William G. Mundy,* Deputy Attorney General, and *Donald P. Bogard* filed a brief for the State of Indiana as *amicus curiae* urging reversal.

Eleventh Amendment.[1]  The issue now before us is whether that same federal court may, consistent with the Eleventh Amendment, order those state officials to send a mere explanatory notice to members of the plaintiff class advising them that there are state administrative procedures available by which they may receive a determination of whether they are entitled to past welfare benefits.  We granted certiorari to resolve an apparent conflict between the decision of the United States Court of Appeals for the Seventh Circuit in this case and that of the Court of Appeals for the Third Circuit in *Fanty* v. *Commonwealth of Pennsylvania, Dept. of Public Welfare,* 551 F. 2d 2 (1977).[2]  435 U. S. 904 (1978). We believe that the case as it now comes to us involves little, if any, unbroken ground in this area, and affirm the judgment of the Seventh Circuit.

Following our remand in *Edelman,* the United States District Court for the Northern District of Illinois, upon motion of the plaintiff, ordered the state officials to send to each

---

[1] The history of this case is set forth in greater detail in *Edelman* v. *Jordan,* 415 U. S. 651 (1974).

[2] In *Fanty,* the plaintiff class alleged that the manner in which the defendant state officials had collected class members' federal benefits in reimbursement of amounts granted under state welfare laws violated this Court's decision in *Philpott* v. *Essex County Welfare Board,* 409 U. S. 413 (1973).  The District Court agreed, and while it denied retroactive relief against the State on the basis of *Edelman* v. *Jordan, supra,* it did require the defendant state officials to notify plaintiff class members that under *Philpott* they have no legal obligation to make reimbursement out of their federal disability benefits and that as a matter of state law they may have a cause of action against the Department of Public Welfare for refund of prior payments.  The Court of Appeals, in three separate opinions, reversed.  Chief Judge Seitz was of the opinion that the notice relief was barred by the Eleventh Amendment.  Judge Garth, concurring in the result, believed that the Eleventh Amendment issue was "borderline," 551 F. 2d, at 6, but voted to reverse on the basis that there was no case or controversy.  Judge Hunter dissented on grounds not relevant here.  However, he disagreed with Chief Judge Seitz that the Eleventh Amendment prohibited the notice relief.

member of the plaintiff class a notice informing the recipient: "[Y]ou were denied public assistance to which you were entitled in the amount of $————." *Jordan* v. *Trainor,* 405 F. Supp. 802, 809 (1975).[3] Enclosed with the required mailing was to be a "Notice of Appeal," which when signed and returned to the Illinois Department of Public Aid, requested a hearing on the denial of benefits. That notice stated: "The department illegally delayed in the processing of my AABD application, and, as a consequence, denied me benefits to which I was and am entitled." *Id.,* at 810.

The Court of Appeals, en banc, found that this proposed form of notice would have been barred by the Eleventh Amendment, since it at least purported to decide that Illinois public funds should be used to satisfy the claims of plaintiff class members without the consent of the State by its appropriate officials. *Jordan* v. *Trainor,* 563 F. 2d 873, 875 (1977).[4] The

---

[3] Because this was a class action qualifying under Fed. Rule Civ. Proc. 23 (b)(2), the class members had never received notice of the complaint, the original lower court judgment, this Court's decision or its effect on them. See *Eisen* v. *Carlisle & Jacquelin,* 417 U. S. 156, 177 n. 14 (1974); Fed. Rule Civ. Proc. 23 (e). Under Rule 23 (d)(2), however, a court may require appropriate notice "for the protection of the members of the class or otherwise for the fair conduct of the action."

Prior to ordering notice, the District Court requested the parties to submit information with respect to the number of persons in the plaintiff class, the cost of notifying them, the amounts involved, and other issues affecting the equities of sending notice. Respondent filed his response to the court's request but the state officials submitted no response. Respondent indicated that there were approximately 20,000 to 33,500 members in the plaintiff class. App. 34a. The cost of identifying class members was stated to be simply the cost of running the department's computer for a period necessary to cull out the names of the plaintiff class members. Respondent claimed that there would be no additional cost of notifying class members because the notice could be included in one of the regular mailings to the members of the plaintiff class. Petitioner has not disputed respondent's allegations either below or before this Court.

[4] A panel of the Seventh Circuit originally had reversed the District Court's order requiring notice on the ground that the Eleventh Amend-

court reversed the District Court's order for this reason, but stated that on remand the District Court could order the state officials to send a "mere explanatory notice to applicants advising them that there is a state administrative procedure available if they desire to have the state determine whether or not they may be eligible for past benefits. A simple returnable notice of appeal form could also be provided." *Ibid.* In the court's view, such a notice would not violate the distinction set forth in *Edelman* between prospective relief, which is permitted by the Eleventh Amendment, and retrospective relief, which is not:

> "The form of notice we envisage would not create a 'liability' against the state. Whether a liability might result would be a matter for state determination, not the federal court. No federal judgment against the state would be created. Such a notice could not be labeled equitable restitution or be considered an award of damages against the state. The defendant makes no issue out of any incidental administrative expense connected with the preparation or mailing of the notice. It has suggested in the record that the notice could be included in the regular monthly mailing. The necessary information comes from a computer. There is no indication that the administrative expense would be substantial." 563 F. 2d, at 876.

Under the contemplated modified notice procedure, the court stated, members of the plaintiff class would be given no more than "they would have gathered by sitting in the courtroom or by reading and listening to news accounts had the case attracted any attention." *Id.,* at 877–878.[5] Three judges dis-

---

ment was a "jurisdictional bar to the exercise of federal judicial power concerning past action or inaction of a state with respect to the Aid to the Aged, Blind, or Disabled Program." *Jordan* v. *Trainor,* 551 F. 2d 152, 155 (1977).

[5] In reaching its decision, the Seventh Circuit relied in part on our summary affirmance of *Grubb* v. *Sterrett,* 315 F. Supp. 990 (ND Ind.),

sented on the ground that the majority's revised notice form was barred by the Eleventh Amendment.

In *Edelman* we reaffirmed the rule that had evolved in our earlier cases that a suit in federal court by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment. 415 U. S., at 663; see *Kennecott Copper Corp.* v. *State Tax Comm'n*, 327 U. S. 573 (1946); *Ford Motor Co.* v. *Department of Treasury*, 323 U. S. 459 (1945); *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47 (1944). We rejected the notion that simply because the lower court's grant of retroactive benefits had been styled "equitable restitution" it was permissible under the Eleventh Amendment. But we also pointed out that under the landmark decision in *Ex parte Young*, 209 U. S. 123 (1908), a federal court, consistent with the Eleventh Amendment, may enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury. 415 U. S., at 667–668; see *Milliken* v. *Bradley*, 433 U. S. 267, 289 (1977); *Scheuer* v. *Rhodes*, 416 U. S. 232, 237 (1974). The distinction between that relief permissible under the doctrine of *Ex parte Young* and that found barred in *Edelman* was the difference between prospective relief on one hand and retrospective relief on the other.[6]

---

aff'd, 400 U. S. 922 (1970), in which the District Court had ordered Indiana public assistance officials to send to plaintiff class members a notice similar to the one at issue here. As the Court of Appeals recognized, the list of summary affirmances overruled in *Edelman* was not necessarily intended to be exhaustive. See *Jordan* v. *Trainor*, 563 F. 2d, at 876. However, we prefer to rest our affirmance of the judgment of the Court of Appeals in this case on our conclusion that it is consistent with *Edelman*.

[6] As we stated in *Edelman*:

"[T]hat portion of the District Court's decree which petitioner challenges on Eleventh Amendment grounds goes much further than [*Ex parte*

Petitioner state official devotes a significant part of his brief to an attack on the proposed notice which the District Court required the state officials to send. It is, however, the decision of the Court of Appeals, and not that of the District Court, which we review at the behest of petitioner. And just as petitioner insists on tilting at windmills by attacking the District Court's decision, respondent suggests that our decision in *Edelman* has been eviscerated by later decisions such as *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978). Brief for Respondent 55 n. 37. See also *Aldridge* v. *Turlington,* No. TCA–78–830 (ND Fla., Nov. 17, 1978); but see *Skehan* v. *Board of Trustees of Bloomsburg State College,* 590 F. 2d 470 (CA3 1978). As we have noted above, we held in *Edelman* that in "a [42 U. S. C.] § 1983 action . . . a federal court's remedial power, consistent with the Eleventh Amendment, is necessarily limited to prospective injunctive relief, *Ex parte Young, supra,* and may not include a retroactive award which requires the payment of funds from the state treasury, *Ford Motor Co.* v. *Department of Treasury, supra.*" 415 U. S., at 677. We disagree with respondent's suggestion. This Court's holding in *Monell* was "limited to local government units which are not considered part of the State for Eleventh Amendment purposes," 436 U. S., at 690 n. 54, and our Eleventh Amendment decisions subsequent to *Edelman* and to *Monell* have cast no doubt on our holding in *Edelman.* See *Alabama* v. *Pugh,* 438 U. S. 781 (1978);

---

*Young* and the cases that had followed it]. It requires payment of state funds, not as a necessary consequence of compliance in the future with a substantive federal-question determination, but as a form of compensation to those whose applications were processed on the slower time schedule at a time when petitioner was under no court-imposed obligation to conform to a different standard. . . . It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials who were the defendants in the action. It is measured in terms of a monetary loss resulting from a past breach of a legal duty on the part of the defendant state officials." 415 U. S., at 668.

*Hutto* v. *Finney,* 437 U. S. 678 (1978); *Milliken* v. *Bradley, supra; Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976); *Scheuer* v. *Rhodes, supra.*[7]

While the separate opinions in *Hutto* v. *Finney, supra,*[8] debated the continuing soundness of *Edelman* after our decision in *Monell,* any doubt on that score was largely dispelled by *Alabama* v. *Pugh, supra,* decided just 10 days after *Hutto.* In *Pugh* the Court held, over three dissents, that the State of Alabama could not be joined as a defendant without violating the Eleventh Amendment, even though the complaint was based on 42 U. S. C. § 1983 and the claim was a violation of

---

[7] MR. JUSTICE BRENNAN's opinion concurring in the judgment states that *"Edelman* v. *Jordan, supra,* had held that § 1983 did not override state immunity, for the reason, as the Court later stated in *Fitzpatrick,* that '[t]he Civil Rights Act of 1871, 42 U. S. C. § 1983, had been held in *Monroe* v. *Pape,* 365 U. S. 167, 187–191 (1961), to exclude cities and other municipal corporations from its ambit; that being the case, it could not have been intended to include States as parties defendant.'" *Post,* at 351. Since *Monell* overruled *Monroe*'s holding that cities and other municipal corporations are not "persons" within the meaning of § 1983, MR. JUSTICE BRENNAN's opinion argues that the "premise" of *Edelman* has been "undercut." *Post,* at 351. The fallacy of this line of reasoning was aptly demonstrated last Term by MR. JUSTICE POWELL in his concurring opinion in *Hutto,* where he stated: "The language in question from *Fitzpatrick* was not essential to the Court's holding in that case. Moreover, this position ignores the fact that *Edelman* rests squarely on the Eleventh Amendment immunity, without adverting in terms to the treatment of the legislative history in *Monroe* v. *Pape* . . . ." 437 U. S., at 708–709, n. 6. In fact, *Monroe* v. *Pape* is not even cited in *Edelman.*

[8] In *Hutto* v. *Finney* there were three separate opinions in addition to that of the Court. Two opinions expressed the view that the Court had misapplied the rule laid down in *Edelman.* 437 U. S., at 704 (POWELL, J., concurring and dissenting); *id.,* at 710 (REHNQUIST, J., dissenting). MR. JUSTICE BRENNAN, though joining the opinion of the Court, wrote separately to suggest that the Court's opinions in *Monell* and *Fitzpatrick* v. *Bitzer* had rendered "the essential premise of our *Edelman* holding . . . no longer true." 437 U. S., at 703. The Court itself in *Hutto,* however, recognized and applied *Edelman*'s distinction between retrospective and prospective relief.

the Eighth and Fourteenth Amendments similar to that made in *Hutto*. The Court said:

"There can be no doubt, however, that suit against the State and its Board of Corrections is barred by the Eleventh Amendment, unless Alabama has consented to the filing of such a suit. *Edelman* v. *Jordan,* 415 U. S. 651 (1974); *Ford Motor Co.* v. *Department of Treasury,* 323 U. S. 459 (1945); *Worcester County Trust Co.* v. *Riley,* 302 U. S. 292 (1937)." 438 U. S., at 782.[9]

The decision in *Pugh* was consistent both with *Monell*, which was limited to "local government units," 436 U. S., at 690 n. 54, and with *Fitzpatrick* v. *Bitzer, supra.* In the latter case we found that " 'threshold fact of congressional authorization,' " which had been lacking in *Edelman*, to be present in the express language of the congressional amendment making Title VII of the Civil Rights Act of 1964 applicable to state and local governments. 427 U. S., at 452, quoting *Edelman* v. *Jordan,* 415 U. S., at 672.

MR. JUSTICE BRENNAN in his opinion concurring in the judgment argues that our holding in *Edelman* that § 1983 does not abrogate the States' Eleventh Amendment immunity is "most likely incorrect." *Post,* at 354. To reach this conclu-

---

[9] Our Brother BRENNAN in his opinion concurring in the judgment curiously suggests that the language quoted from *Pugh* in the text could not mean what it, on its face, says, because the briefs in the case were filed before our decision in *Monell* was announced. *Post,* at 352–354. But while the parties in *Pugh* were "without the benefit of *Monell's* major re-evaluation of the legislative history of § 1983," *post,* at 352–353, the Members of this Court labored under no similar disability. The decision in *Pugh* was handed down nearly one month after *Monell* and 10 days after *Hutto,* where separate opinions debated this precise point. If, after *Monell* and *Hutto,* this Court harbored any doubts about the continued validity of *Edelman's* conclusion that § 1983 does not constitute a waiver of the Eleventh Amendment immunity of the States, it is inconceivable that the Court would have taken the extraordinary action of summarily reversing a lower court on the basis of *Edelman.*

sion he relies on "assum[ptions]" drawn from the Fourteenth Amendment, *post,* at 355, on "occasional remarks" found in a legislative history that contains little debate on § 1 of the Civil Rights Act of 1871, 17 Stat. 13, the precursor to § 1983, *post,* at 358 n. 15,[10] on the reference to "bodies politic" in the Act of Feb. 25, 1871, 16 Stat. 431, the "Dictionary Act," *post,* at 355–357,[11] and, finally on the general language of § 1983 itself, *post,* at 356. But, unlike our Brother Brennan, we simply are unwilling to believe, on the basis of such slender "evidence," that Congress intended by the general language of § 1983 to override the traditional sovereign immunity of the States. We therefore conclude that neither the reasoning of *Monell* or of our Eleventh Amendment cases subsequent to *Edelman,* nor the additional legislative history or arguments set forth in Mr. Justice Brennan's opinion, justify a conclusion different from that which we reached in *Edelman.*[12]

---

[10] There was only limited debate on § 1 of the Civil Rights Act of 1871, and it passed without amendment. *Monell* v. *New York City Dept. of Social Services,* 436 U. S., at 665. The sections that drew most of the debate were those that created certain federal crimes, permitted the President to send the militia to any State with widespread Ku Klux Klan violence, and authorized suspension of the writ of habeas corpus in certain circumstances. *Id.,* at 665 n. 11.

[11] The Dictionary Act was intended to provide a "few general rules for the construction of statutes." Cong. Globe, 41st Cong., 3d Sess., 1474 (1871) (remarks of Rep. Poland). While it was enacted two months before the enactment of the 1871 Civil Rights Act, it came more than five years *after* passage of § 2 of the Civil Rights Act of 1866, 14 Stat. 27, which served as the model for the language of § 1 of the 1871 Act. Cong. Globe, 42d Cong., 1st Sess., App. 68 (1871) (remarks of Rep. Shellabarger); see *Monroe* v. *Pape,* 365 U. S. 167, 183–185 (1961); *post,* at 362 n. 17.

[12] Mr. Justice Brennan's opinion characterizes this conclusion as "gratuitous" and "paten[t] dicta." *Post,* at 350. But we cannot think of a more "gratuitous" or useless exercise of this Court's discretionary jurisdiction than to decide which of two conflicting interpretations of *Edelman* v. *Jordan* is correct, if in truth we believed that *Edelman* itself no longer were valid. The question does not arise out of the blue; it was extensively discussed in our Brother Brennan's concurrence in *Hutto* v. *Finney* last

There is no question that both the supporters and opponents of the Civil Rights Act of 1871 believed that the Act ceded to the Federal Government many important powers that previously had been considered to be within the exclusive province of the individual States.[13] Many of the remarks from the legislative history of the Act quoted in MR. JUSTICE BRENNAN's opinion amply demonstrate this point. *Post*, at 359–365. See also *Monroe* v. *Pape*, 365 U. S. 167, 173–176 (1961). But neither logic, the circumstances surrounding the adoption of the Fourteenth Amendment, nor the legislative history of the 1871 Act compels, or even warrants, a leap from this proposition to the conclusion that Congress intended by the general language of the Act to overturn the constitutionally guaranteed immunity of the several States.[14] In *Tenney* v. *Brandhove*, 341 U. S. 367 (1951), the Court rejected a simi-

Term. We therefore fail to see how our reaffirmance of *Edelman* can be characterized as "dicta."

[13] For example, the Act was attacked as an attempt to strip States of the power to punish and proscribe offenses within their borders, *e. g.*, Cong. Globe, 42d Cong., 1st Sess., 396 (1871) (remarks of Rep. Rice); *id.*, at App. 112 (remarks of Rep. Moore); *id.*, at App. 117 (remarks of Sen. Blair), and of their authority to decide when the militia of the United States should be called into their territory to quell domestic disturbances, *e. g.*, *id.*, at 647 (remarks of Sen. Davis); *id.*, at App. 139 (remarks of Rep. McCormick).

[14] Indeed the *Prigg-Dennison-Day* line of cases, relied on so heavily in *Monell*, would surely militate against such a conclusion. 436 U. S., at 672–683; see *Prigg* v. *Pennsylvania*, 16 Pet. 539 (1842); *Kentucky* v. *Dennison*, 24 How. 66 (1861); *Collector* v. *Day*, 11 Wall. 113 (1871). Our Brother BRENNAN's concurrence in the judgment today relies on *Ex parte Virginia*, 100 U. S. 339 (1880), and on *Virginia* v. *Rives*, 100 U. S. 313 (1880). But these cases were decided nearly a decade after the enactment of the Civil Rights Act of 1871, and as noted in *Monell*, substantially undercut the *Prigg-Dennison-Day* line of cases for purposes of enforcement of the Fourteenth Amendment. 436 U. S., at 676. But (as was noted in *Monell*) it was the *Prigg-Dennison-Day* line of cases that was "the reigning constitutional theory of [the] day" when the Civil Rights Act of 1871 was debated and enacted. 436 U. S., at 676.

lar attempt to interpret the word "person" in § 1983 as a with-
drawal of the historic immunity of state legislators. The
Court's words bear repeating here:

> "Did Congress by the general language of its 1871 stat-
> ute mean to overturn the tradition of legislative freedom
> achieved in England by Civil War and carefully pre-
> served in the formation of State and National Govern-
> ments here? Did it mean to subject legislators to civil
> liability for acts done within the sphere of legislative
> activity? . . . The limits of §§ 1 and 2 of the 1871
> statute—now §§ 43 and 47 (3) of Title 8—were not
> spelled out in debate. We cannot believe that Con-
> gress—itself a staunch advocate of legislative freedom—
> would impinge on a tradition so well grounded in his-
> tory and reason by covert inclusion in the general lan-
> guage before us." 341 U. S., at 376.

Given the importance of the States' traditional sovereign
immunity, if in fact the Members of the 42d Congress
believed that § 1 of the 1871 Act overrode that immunity,
surely there would have been lengthy debate on this point
and it would have been paraded out by the opponents of
the Act along with the other evils that they thought would
result from the Act. Instead, § 1 passed with only limited
debate and not one Member of Congress mentioned the
Eleventh Amendment or the direct financial consequences to
the States of enacting § 1. We can only conclude that this
silence on the matter is itself a significant indication of the
legislative intent of § 1.

Our cases consistently have required a clearer showing of
congressional purpose to abrogate Eleventh Amendment im-
munity than our Brother BRENNAN is able to marshal. In
*Employees* v. *Missouri Public Health Dept.*, 411 U. S. 279
(1973), the Court concluded that Congress did not lift the
sovereign immunity of the States by enacting the Fair Labor
Standards Act of 1938, 29 U. S. C. §§ 201–219, because of

the absence of any indication "by clear language that the constitutional immunity was swept away. It is not easy to infer that Congress in legislating pursuant to the Commerce Clause, which has grown to vast proportions in its applications, desired silently to deprive the States of an immunity they have long enjoyed under another part of the Constitution." 411 U. S., at 285.[15] In *Fitzpatrick* v. *Bitzer* the Court found present in Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.*, the "threshold fact of congressional authorization" to sue the State as employer, because the statute made explicit reference to the availability of a private action against state and local governments in the event the Equal Employment Opportunity Commission or the Attorney General failed to bring suit or effect a conciliation agreement. 427 U. S., at 448 n. 1, 449 n. 2, 452; see Equal Opportunity Employment Act of 1972, 86 Stat. 105, 42 U. S. C. § 2000e–5 (f)(1); H. R. Rep. No. 92–238, pp. 17–19 (1971); S. Rep. No. 92–415, pp. 9–11 (1971); S. Conf. Rep. No. 92–681, pp. 17–18 (1972); H. R. Conf. Rep. No. 92–899, pp. 17–18 (1972). Finally, in *Hutto* v. *Finney,* decided just last Term, the Court held that in enacting the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988, Congress intended to override the Eleventh Amendment immunity of the States and authorize fee awards payable by the States when their officials are sued in their official capacities. 437 U. S., at 693–694. Although the statutory language in *Hutto* did not separately impose liability on States in so many words,[16] the statute had

---

[15] The Court in *Employees* "found not a word in the history of the [statute] to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts." 411 U. S., at 285. The Court also added that its interpretation of the law did not render the statute's inclusion of state institutions meaningless. *Id.,* at 285–286.

[16] While *Hutto,* unlike *Fitzpatrick* and *Employees,* did not require an express statutory waiver of the State's immunity, 437 U. S., at 695, 698 n. 31, the Court was careful to emphasize that it was concerned only with

"a history focusing directly on the question of state liability; Congress considered and firmly rejected the suggestion that States should be immune from fee awards." *Id.*, at 698 n. 31. Also, the Court noted that the statute would have been rendered meaningless with respect to States if the Act did not impose liability for attorney's fees on the States. *Ibid.;* see *Employees* v. *Missouri Public Health Dept., supra,* at 285–286. By contrast, § 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States. Nor does our reaffirmance of *Edelman* render § 1983 meaningless insofar as States are concerned. See *Ex parte Young,* 209 U. S. 123 (1908).[17]

---

expenses incurred in litigation seeking prospective relief while the other cases involved retroactive liability for prelitigation conduct. *Id.*, at 695. The Court also noted that it was not concerned with a statute that imposed " 'enormous fiscal burdens on the States' " and that if it were, it might require a formal indication of Congress' intent to abrogate the States' Eleventh Amendment immunity, as did *Employees* and *Fitzpatrick.* 437 U. S., at 697 n. 27. Extending § 1983 liability to States obviously *would* place "enormous fiscal burdens on the States." But we need not reach the question whether an express waiver is required because neither the language of the statute nor the legislative history discloses an intent to overturn the States' Eleventh Amendment immunity by imposing liability directly upon them.

[17] The arguments in MR. JUSTICE BRENNAN's opinion regarding *Osborn* v. *Bank of the United States,* 9 Wheat. 738 (1824), are similarly unpersuasive. *Post,* at 359–361, n. 16. Mr. Chief Justice Marshall's opinion in *Osborn* makes it clear that in determining whether a court can grant relief the key inquiry is whether the state officer was in fact the real party in interest or whether he was only a nominal party. 9 Wheat., at 858. See also *Bank of United States* v. *Planters' Bank of Georgia,* 9 Wheat. 904, 907 (1824). Mr. Chief Justice Marshall emphasized this precise point just four years later in his opinion for the Court in *Governor of Georgia* v. *Madrazo,* 1 Pet. 110 (1828). In *Madrazo,* a vessel carrying slaves was seized and the

We turn, then, to the question which has caused disagreement between the Courts of Appeals: does the modified notice contemplated by the Seventh Circuit constitute per-

---

slaves were delivered into the possession of the Governor of Georgia. The slaves were sold and the proceeds were placed in the state treasury. Madrazo filed a libel in the Federal District Court, naming the Governor of Georgia, among others, as a defendant. Restitution was ordered by the lower courts, but this Court reversed because although the demand for relief nominally was against the Governor of the State, it was clear that the action in fact sought relief directly from the state treasury, relief that was forbidden by the Eleventh Amendment.

"The claim upon the governor, is as a governor; he is sued, not by his name, but by his title. The demand made upon him, is not made personally, but officially.

"The decree is pronounced not against the person, but the officer, and appeared to have been pronounced against the successor of the original defendant; as the appeal bond was executed by a different governor from him who filed the information. In such a case, *where the chief magistrate of a state is sued, not by his name, but by his style of office, and the claim made upon him is entirely in his official character, we think the state itself may be considered as a party on the record. If the state is not a party, there is no party against whom a decree can be made.* No person in his natural capacity is brought before the Court as defendant. This not being a proceeding against the thing, but against the person, a person capable of appearing as a defendant, against whom a decree can be pronounced, must be a party to the cause before a decree can be regularly pronounced." *Id.*, at 123–124 (emphasis added).

To similar effect see *Kentucky* v. *Dennison*, 24 How., at 97–98, which reaffirmed these principles of *Madrazo* and which, as the Court in *Monell* emphasized, was "well known to Members of Congress" at the time of the passage of the 1871 Act. 436 U. S., at 679. To the extent that *Davis* v. *Gray*, 16 Wall. 203 (1873), which did no more than affirm an injunctive decree against a state official, is inconsistent with the rule applied in *Edelman*, it suffices to say that it was repudiated long before the latter decision. In *Ford Motor Co.* v. *Department of Treasury*, 323 U. S. 459 (1945), the Court stated:

"[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants." *Id.*, at 464.

missible prospective relief or a "retroactive award which requires the payment of funds from the state treasury"? We think this relief falls on the *Ex parte Young* side of the Eleventh Amendment line rather than on the *Edelman* side.[18] Petitioner makes no issue of the incidental administrative expense connected with preparing and mailing the notice.[19] Instead, he argues that giving the proposed notice will lead inexorably to the payment of state funds for retroactive benefits and therefore it, in effect, amounts to a monetary award. But the chain of causation which petitioner seeks to establish is by no means unbroken; it contains numerous missing links, which can be supplied, if at all, only by the State and members of the plaintiff class and not by a federal court. The notice approved by the Court of Appeals simply apprises plaintiff class members of the existence of whatever adminis-

---

[18] In addition to petitioner's Eleventh Amendment arguments, he contends that the Court of Appeals' notice violates the law of the case as established in *Edelman* v. *Jordan,* 415 U. S. 651 (1974). We disagree. The doctrine of law of the case comes into play only with respect to issues previously determined. *In re Sanford Fork & Tool Co.,* 160 U. S. 247 (1895). On remand, the "Circuit Court may consider and decide any matters left open by the mandate of this court." *Id.,* at 256. Accord, *Wells Fargo & Co.* v. *Taylor,* 254 U. S. 175 (1920). The Court in *Edelman* considered the constitutionality only of the relief before it. 415 U. S., at 665. It was not presented with the question of the propriety of notice relief. Petitioner also claims that the District Court lacked power to order notice under the terms of this Court's remand. The simple answer to this contention is that we remanded the matter in *Edelman* "for further proceedings consistent with this opinion," and we hold today that the award of notice relief, as fashioned by the Court of Appeals, is not inconsistent with either the spirit or express terms of our decision in *Edelman.* "While a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Sprague* v. *Ticonic National Bank,* 307 U. S. 161, 168 (1939), citing *In re Sanford Fork & Tool Co., supra.*

[19] It appears from respondent's answers to a District Court request that any expense associated with the preparation and mailing of the notice would be *de minimis.* See n. 3, *supra.*

trative procedures may already be available under state law by which they may receive a determination of eligibility for past benefits. The notice of appeal, we are told, is virtually identical to the notice sent by the Department of Public Aid in every case of a denial or reduction of benefits. The mere sending of that notice does not trigger the state administrative machinery. Whether a recipient of notice decides to take advantage of those available state procedures is left completely to the discretion of that particular class member; the federal court plays no role in that decision. And whether or not the class member will receive retroactive benefits rests entirely with the State, its agencies, courts, and legislature, not with the federal court.[20]

---

[20] As of January 1, 1974, the Aid to the Aged, Blind, and Disabled program was replaced by a completely federal-funded Supplemental Security Income program. Pub. L. 92–603, Title III, § 301, 86 Stat. 1465. Petitioner argues that the notice relief is impermissible because if retroactive benefits ultimately are awarded to the plaintiff class members, there is little likelihood that the Federal Government will reimburse the State for assistance payments made relating to a now defunct program. Thus, Illinois would have to bear the total cost of such retroactive payments. This fact may well be relevant to the state agency's or court's determination of whether to award retroactive benefits. But since the notice relief does not constitute a money judgment, it is not at all relevant to the question of the propriety of the notice fashioned by the Court of Appeals.

Petitioner also states that even if the Department of Public Aid determines to grant retroactive relief, it may not request the Comptroller to draw, or the Treasurer to make payments from, funds appropriated for a current fiscal year for an outstanding obligation incurred during a prior fiscal year without the express authorization from the legislature. See Reply Brief for Petitioner 5. Thus, as a result of the lapse of Public Aid appropriations for fiscal years 1968, 1969, 1970, and 1971, petitioner claims that members of the plaintiff class would be required to resort to filing claims against the State in the Illinois Court of Claims. These facts may influence a plaintiff class member in deciding whether to pursue existing state remedies or the legislature in determining whether to give its approval to a payment of retroactive benefits, but they do not affect

The notice approved by the Court of Appeals, unlike that ordered by the District Court, is more properly viewed as ancillary to the prospective relief already ordered by the court. See *Milliken* v. *Bradley,* 433 U. S., at 290. The notice in effect simply informs class members that their federal suit is at an end, that the federal court can provide them with no further relief, and that there are existing state administrative procedures which they may wish to pursue. Petitioner raises no objection to the expense of preparing or sending it. The class members are "given no more . . . than what they would have gathered by sitting in the courtroom." *Jordan* v. *Trainor,* 563 F. 2d, at 877–878. The judgment of the Court of Appeals is therefore

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins as to Parts I, II, and III, concurring in the judgment.

For the reasons set forth in my dissent in *Edelman* v. *Jordan,* 415 U. S. 651, 687 (1974), I concur in the judgment of the Court.[1]

---

our conclusion that the notice relief awarded here is permissible under the Eleventh Amendment.

[1] In *Edelman* v. *Jordan,* 415 U. S., at 687–688, I stated:

"This suit is brought by Illinois citizens against Illinois officials. In that circumstance, Illinois may not invoke the Eleventh Amendment, since that Amendment bars only federal court suits against States by citizens of other States. Rather, the question is whether Illinois may avail itself of the nonconstitutional but ancient doctrine of sovereign immunity as a bar to respondent's claim for retroactive AABD payments. In my view Illinois may not assert sovereign immunity for the reason I expressed in dissent in *Employees* v. *Missouri Public Health Dept.,* 411 U. S. 279, 298 (1973): the States surrendered that immunity in Hamilton's words, 'in the plan of the Convention,' that formed the Union, at least insofar as the States granted Congress specifically enumerated powers. See *id.,* at 319 n. 7; *Parden* v. *Terminal R. Co.,* 377 U. S. 184 (1964). Congressional authority to enact the Social Security Act, of which AABD is a part, former 42 U. S. C. §§ 1381–1385 (now replaced by similar provisions in 42 U. S. C. §§ 801–804

## I

It is deeply disturbing, however, that the Court should engage in today's gratuitous departure from customary judicial practice and reach out to decide an issue unnecessary to its holding. The Court today correctly rules that the explanatory notice approved by the Court of Appeals below is "properly viewed as ancillary to . . . prospective relief." *Ante,* at 349. This is sufficient to sustain the Court's holding that such notice is not barred by the Eleventh Amendment. But the Court goes on to conclude, in what is patently dicta, that a State is not a "person" for purposes of 42 U. S. C. § 1983, Rev. Stat. § 1979.[2]

This conclusion is significant because, only three Terms ago, *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976), held that "Congress may, in determining what is 'appropriate legislation' for the purpose of enforcing the provisions of the Fourteenth Amendment, provide for private suits against States or state officials which are constitutionally impermissible in other contexts." *Id.,* at 456. If a State were a "person" for purposes of § 1983, therefore, its immunity under the Eleventh

(1970 ed., Supp. II), is to be found in Art. I, § 8, cl. 1, one of the enumerated powers granted Congress by the States in the Constitution. I remain of the opinion that 'because of its surrender, no immunity exists that can be the subject of a congressional declaration or a voluntary waiver,' 411 U. S., at 300, and thus have no occasion to inquire whether or not Congress authorized an action for AABD retroactive benefits, or whether or not Illinois voluntarily waived the immunity by its continued participation in the program against the background of precedents which sustained judgments ordering retroactive payments."

[2] Section 1983 states:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

Amendment would be abrogated by the statute.[3] *Edelman* v. *Jordan, supra,* had held that § 1983 did not override state immunity, for the reason, as the Court later stated in *Fitzpatrick,* that "[t]he Civil Rights Act of 1871, 42 U. S. C. § 1983, had been held in *Monroe* v. *Pape,* 365 U. S. 167, 187–191 (1961), to exclude cities and other municipal corporations from its ambit; that being the case, it could not have been intended to include States as parties defendant." 427 U. S., at 452.[4] The premise of this reasoning was undercut last Term, however, when *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), upon re-examination of the legislative history of § 1983, held that a municipality was indeed a "person" for purposes of that statute.[5] As I stated in my concurrence in *Hutto* v. *Finney,* 437 U. S. 678, 703 (1978), *Monell* made it "surely at least an open question whether § 1983 properly construed does not make the States liable for relief of all kinds, notwithstanding the Eleventh Amendment."

The Court's dicta today would close that open question on the basis of *Alabama* v. *Pugh,* 438 U. S. 781 (1978). In that case the State of Alabama had been named as a party defendant in a suit alleging unconstitutional conditions of confine-

---

[3] There is no question but that § 1983 was enacted by Congress under § 5 of the Fourteenth Amendment. Section 1983 was originally the first section of an Act entitled "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States . . . ." 17 Stat. 13.

[4] This reasoning had been employed by several lower courts which had considered this question. See, *e. g., United States ex rel. Gittlemacker* v. *County of Philadelphia,* 413 F. 2d 84, 86 n. 2 (CA3 1969) ("In view of the Supreme Court's holding in Monroe v. Pape . . . that a municipal corporation is not a 'person' subject to suit within the meaning of the Civil Rights Act, the conclusion that states are not persons within the meaning of the Act is inescapable"); *Williford* v. *California,* 352 F. 2d 474, 476 (CA9 1965).

[5] For a discussion of the implications of *Monell* for this question, see *Aldridge* v. *Turlington,* Civ. Act. No. TCA–78–830 (ND Fla., Nov. 17, 1978).

ment. The question presented was "[w]hether the mandatory injunction issued against the State of Alabama and the Alabama Board of Corrections violates the State's Eleventh Amendment immunity or exceeds the jurisdiction granted federal courts by 42 U. S. C. § 1983." *Id.*, at 782–783, n. 2. The Court held that the State should not have been named as a party defendant.

*Pugh,* however, does not stand for the proposition that a State is not a "person" for purposes of § 1983. Not only does the Court's opinion in that case fail even to mention § 1983, it frames the issue addressed as whether Alabama had "consented to the filing of such a suit." 438 U. S., at 782. Since Alabama's consent would have been irrelevant if Congress had intended States to be encompassed within the reach of § 1983, the Court apparently decided the first half of the question presented—"[w]hether the mandatory injunction issued against the State of Alabama . . . violates the State's Eleventh Amendment immunity"—without considering or deciding the second half—whether the mandatory injunction "exceeds the jurisdiction granted federal courts by 42 U. S. C. § 1983." [6]

This parsing of *Pugh* is strengthened by a consideration of the circumstances surrounding that decision. *Pugh,* a short *per curiam,* was issued on the last day of the Term without the assistance of briefs on the merits or argument. Alabama's petition for certiorari and respondents' brief in opposition were filed on February 6, 1978, and April 6, 1978, respectively, months before *Monell* was announced. They were thus necessarily without the benefit of *Monell*'s major re-evaluation of

---

[6] This is what I take to be the significance of the observation of my Brother STEVENS in *Pugh:*

"Surely the Court does not intend to resolve summarily the issue debated by my Brothers in their separate opinions in *Hutto* v. *Finney,* 437 U. S. 678, 700 (BRENNAN, J., concurring), and 708–709, n. 6 (POWELL, J., concurring in part and dissenting in part)." 438 U. S., at 783 n. * (1978) (STEVENS, J., dissenting). Cf. The Supreme Court, 1977 Term, 92 Harv. L. Rev. 57, 325–326 (1978).

the legislative history of § 1983.[7]  Respondents did not even raise the possibility that Alabama might be a "person" for purposes of § 1983.[8]  Since the issue is not, as the Court now

---

[7] Indeed, the entire discussion of the issue in the petition for certiorari is as follows:

"The grant of an injunction against the State and the Board of Corrections in an action based upon 42 U. S. C. § 1983 is in direct conflict with decisions of other courts of appeal which hold that neither a State nor a State agency is a 'person' within the meaning of the statute and amenable to suit under it. *Meredith* v. *Arizona,* 523 F. 2d 481 (9th Cir. 1975); *Curtis* v. *Everette,* 489 F. 2d 516 (3rd Cir. 1973). The decisions below conflict, at least in principle, with this Court's holding in *City of Kenosha* v. *Bruno,* 412 U. S. 507 (1973), that municipalities are not 'persons' under 42 U. S. C. § 1983." Pet. for Cert. in *Alabama* v. *Pugh,* O. T. 1977, No. 77–1107, pp. 11–12.

[8] The discussion of the issue by the respondents in *Pugh* was unilluminating:

"Supreme Court Rule 19 (1) states that certiorari will only be 'granted where there are special and important reasons therefor.' The second issue raised by the Petitioners challenges the injunction against the State of Alabama and the Alabama Board of Corrections alleging: (1) each is immune from suit under the Eleventh Amendment; (2) neither is a 'person' subject to 42 U. S. C. 1983 jurisdiction; and (3) *Edelman* v. *Jordan,* 415 U. S. 651 (1974) and *Ex Parte Young,* 209 U. S. 123 (1908) bar judgments against the State for prospective costs of compliance with an order. Under the facts of these cases, the questions presented are not only unimportant but are essentially irrelevant.

"First, additional defendants enjoined include all members of the Alabama Board of Corrections and numerous other prison officials who would clearly remain bound by the injunction issued, *Scheuer* v. *Rhodes,* 416 U. S. 232 (1974); *Edelman* v. *Jordan,* 415 U. S. 651 (1974) and have the authority in their official capacity to carry out the court's orders. Second, the State of Alabama and the Board of Corrections were only named defendants in the *Pugh* case and not the *James* case. Therefore, any action taken on this issue in *Pugh* would not affect the same relief granted in *James.* Third, this issue was never thought important enough by counsel for the petitioners to raise, brief or argue in the trial court. Fourth, the Court of Appeals did not see fit to speak to this issue at all. Fifth, whether the State of Alabama and/or the Board of Corrections are enjoined in addition to the members of the Board of Corrections has absolutely no practical effect on what has happened or will happen under the

phrases it, whether the Members of this Court were then aware of *Monell, ante,* at 340 n. 9, but rather whether they had before them briefs and arguments detailing the implications of *Monell* for the question of whether a State is a "person" for purposes of § 1983, it is not anomalous that the Court's opinion in *Pugh* failed to address or consider this issue.

The Court's reliance on *Pugh* is particularly significant because the question whether a State is a "person" for purposes of § 1983 is neither briefed nor argued by the parties in the instant case. Indeed, petitioner states flatly that "the *en banc* decision of the Seventh Circuit does not rest upon a conclusion that the term 'person' for purposes of § 1983 includes sovereign states, as opposed to state officials, within its ambit. That issue is not the issue before this Court on Petitioner's Writ for Certiorari." Reply Brief for Petitioner 14. Respondent concurs, stating that "it is unnecessary in this case to confront directly the far-reaching question of whether Congress intended in § 1983 to provide for relief directly against States, as it did against municipalities." Brief for Respondent 55 n. 37.

Thus, the Court today decides a question of major significance without ever having had the assistance of a considered presentation of the issue, either in briefs or in arguments. The result is pure judicial fiat.

## II

This fiat is particularly disturbing because it is most likely incorrect. Section 1983 was originally enacted as § 1 of the Civil Rights Act of 1871. The Act was enacted for the purpose of enforcing the provisions of the Fourteenth Amendment.[9] That Amendment exemplifies the "vast transformation" worked on the structure of federalism in this Nation by the Civil War. *Mitchum* v. *Foster,* 407 U. S. 225, 242 (1972).

---

court's order." Brief in Opposition in *Alabama* v. *Pugh,* O. T. 1977, No. 77–1107, pp. 9–10.

[9] See n. 3, *supra.*

The prohibitions of that Amendment "are directed to the States . . . . They have reference to actions of the political body denominated a State, by whatever instruments or in whatever modes that action may be taken." *Ex parte Virginia,* 100 U. S. 339, 346–347 (1880).[10] The fifth section of the Amendment provides Congress with the power to enforce these prohibitions "by appropriate legislation." "Congress, by virtue of the fifth section . . . , may enforce the prohibitions whenever they are disregarded by either the Legislative, the Executive, or the Judicial Department of the State. The mode of enforcement is left to its discretion." *Virginia* v. *Rives,* 100 U. S. 313, 318 (1880).

The prohibitions of the Fourteenth Amendment and Congress' power of enforcement are thus directed at the States themselves, not merely at state officers. It is logical to assume, therefore, that § 1983, in effectuating the provisions of the Amendment by "interpos[ing] the federal courts between the States and the people, as guardians of the people's federal rights," *Mitchum* v. *Foster, supra,* at 242, is also addressed to the States themselves. Certainly Congress made this intent plain enough on the face of the statute.

Section 1 of the Civil Rights Act of 1871 created a federal cause of action against "any person" who, "under color of any law, statute, ordinance, regulation, custom, or usage of any State," deprived another of "any rights, privileges, or immunities secured by the Constitution of the United States." On

---

[10] "We have said the prohibitions of the Fourteenth Amendment are addressed to the States. They are, 'No *State* shall make or enforce a law which shall abridge the privileges or immunities of citizens of the United States, . . . nor deny to any person within its jurisdiction the equal protection of the laws.'" 100 U. S., at 346.

"It is these which Congress is empowered to enforce, and to enforce against State action, however put forth, whether that action be executive, legislative, or judicial. Such enforcement is no invasion of State sovereignty. No law can be, which the people of the States have, by the Constitution of the United States, empowered Congress to enact." *Ibid.*

February 25, 1871, less than two months before the enactment of the Civil Rights Act, Congress provided that "in all acts hereafter passed . . . the word 'person' may extend and be applied to bodies politic and corporate . . . unless the context shows that such words were intended to be used in a more limited sense." [11] § 2, 16 Stat. 431. *Monell,* held that "[s]ince there is nothing in the 'context' of the Civil Rights Act calling for a restricted interpretation of the word 'person,' the language of that section should prima facie be construed to include 'bodies politic' among the entities that could be sued." 436 U. S., at 689–690, n. 53. Even the Court's opinion today does not dispute the fact that in 1871 the phrase "bodies politic and corporate" would certainly have referred to the States.[12] See *Heim* v. *McCall,* 239 U. S. 175, 188 (1915); *McPherson* v. *Blacker,* 146 U. S. 1, 24 (1892); *Poin-*

---

[11] *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), held that the word "may" in the Act was to be interpreted as the equivalent of "shall": "Such a mandatory use of the extended meanings of the words defined by the Act is . . . required for it to perform its intended function—to be a guide to 'rules of construction' of Acts of Congress. See [Cong. Globe, 41st Cong., 3d Sess., 775 (1871)] (remarks of Sen. Trumbull)." *Id.,* at 689 n. 53.

[12] The phrase would also have referred to the United States. As Mr. Chief Justice Marshall stated: "The United States is a government, and, consequently, a body politic and corporate . . . ." *United States* v. *Maurice,* 2 Brock. 96, 109 (CC Va. 1823). See *Van Brocklin* v. *Tennessee,* 117 U. S. 151, 154 (1886); *Dugan* v. *United States,* 3 Wheat. 172, 178 (1818) (argument of Attorney General William Wirt).

In construing the meaning of the term "person" in a Texas law creating a statute of limitations for suits to recover real estate "as against any person in peaceable and adverse possession thereof," this Court stated:

"Of course, the United States were not bound by the laws of the State, yet the word 'person' in the statute would include them as a body politic and corporate. Sayles, Art. 3140; *Martin* v. *State,* 24 Texas, 61, 68." *Stanley* v. *Schwalby,* 147 U. S. 508, 514, 517 (1893).

See *United States* v. *Shirey,* 359 U. S. 255, 257 n. 2 (1959); *Ohio* v. *Helvering,* 292 U. S. 360, 370 (1934); cf. *Pfizer Inc.* v. *India,* 434 U. S. 308, 315–316, n. 15 (1978).

*dexter* v. *Greenhow,* 114 U. S. 270, 288 (1885); *Cotton* v. *United States,* 11 How. 229, 231 (1851); *Chisholm* v. *Georgia,* 2 Dall. 419, 447 (Iredell, J.), 468 (Cushing, J.) (1793); *Utah State Building Comm'n* v. *Great American Indemnity Co.,* 105 Utah 11, 16, 140 P. 2d 763, 766 (1943); *Board of Comm'rs of Hamilton County* v. *Noyes,* 3 Am. L. Rec. 745, 748 (Super. Ct. Cincinnati 1874); 1 J. Wilson, Works 305 (1804); cf. *Keith* v. *Clark,* 97 U. S. 454, 460–461 (1878); *Munn* v. *Illinois,* 94 U. S. 113, 124 (1877); *Georgia* v. *Stanton,* 6 Wall. 50, 76–77 (1868); *Butler* v. *Pennsylvania,* 10 How. 402, 416–417 (1851); *Penhallow* v. *Doane's Administrators,* 3 Dall. 54, 92–93 (1795) (Iredell, J.); Mass. Const., Preamble. Indeed, during the very debates surrounding the enactment of the Civil Rights Act, States were referred to as bodies politic and corporate. See, *e. g.,* Cong. Globe, 42d Cong., 1st Sess., 661–662 (1871) (hereinafter Globe) (Sen. Vickers) ("What is a State? Is it not a body politic and corporate?"); cf. *id.,* at 696 (Sen. Edmunds). Thus the expressed intent of Congress, manifested virtually simultaneously with the enactment of the Civil Rights Act of 1871, was that the States themselves, as bodies corporate and politic, should be embraced by the term "person" in § 1 of that Act.

The legislative history of the Civil Rights Act of 1871 reinforces this conclusion. The Act was originally reported to the House as H. R. 320 by Representative Shellabarger. At that time Representative Shellabarger stated that the bill was meant to be remedial "in aid of the preservation of human liberty and human rights," and thus to be "liberally and beneficently construed."[13] Globe App. 68. The bill

---

[13] *Monell, supra,* stated that "there can be no doubt that § 1 of the Civil Rights Act was intended . . . to be broadly construed . . . ." 436 U. S., at 700. See *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency, post,* at 399–400, and n. 17. Senator Thurman of Ohio, who opposed the Act, stated with respect to § 1 that "there is no limitation whatsoever upon the terms that are employed, and *they are as comprehensive as can be used.*" Cong. Globe, 42d Cong., 1st Sess., App. 217 (1871) (hereinafter Globe App.) (emphasis added).

358

was meant to give "[f]ull force and effect . . . to section five" of the Fourteenth Amendment, Globe 322 (Rep. Stoughton),[14] see *id.*, at 800 (Rep. Perry); *Monell,* 436 U. S., at 685 n. 45, and therefore, like the prohibitions of that Amendment, to be addressed against the States themselves.[15]   See, *e. g.*,

---

[14] One of the reasons given by the Court in *Hutto* v. *Finney,* 437 U. S. 678 (1978), for not requiring an "express statutory waiver of the State's immunity," *ante,* at 344 n. 16, before applying to the States the Civil Rights Attorney's Fees Award Act of 1976, 42 U. S. C. § 1988, was that the Act had been "enacted to enforce the Fourteenth Amendment."   437 U. S., at 698 n. 31.

[15] It was common ground, at least after the Fourteenth Amendment, that Congress could "dea[l] with States and with citizens." Globe 777 (Sen. Frelinghuysen).  See *id.*, at 793 (Rep. Poland).  Representative Willard of Vermont, for example, who voted for H. R. 320, opposed the Sherman amendment, which would have held a municipal corporation liable for damages to its inhabitants by private persons " 'riotously and tumultuously assembled,' " *Monell, supra,* at 664, on the grounds that the Fourteenth Amendment imposed liability directly on the States and not on such municipal corporations:

"I hold that this duty of protection, if it rests anywhere, rests on the State, and that if there is to be any liability visited upon anybody for a failure to perform that duty, such liability should be brought home to the State. Hence, in my judgment, this section would be liable to very much less objection, both in regard to its justice and its constitutionality, if it provided that if in any State the offenses named in this section were committed, suit might be brought against the State, judgment obtained, and payment of the judgment might be enforced upon the treasury of the State."   Globe 791.

See *id.*, at 756–757 (Sen. Edmunds).

There was general agreement, however, that just as Congress could not impose affirmative obligations on municipalities, *Monell, supra,* at 681 n. 40, so it could not "command a State officer to do any duty whatever, as such."  Globe 795 (Rep. Blair).  See *id.*, at 799 (Rep. Farnsworth); *Collector* v. *Day,* 11 Wall. 113 (1871); *Kentucky* v. *Dennison,* 24 How. 66 (1861); *Prigg* v. *Pennsylvania,* 16 Pet. 539 (1842).  Contrary to the suggestion of the Court, *ante,* at 341 n. 14, however, the *Prigg-Dennison-Day* line of cases, which stands for the principle that "the Federal Gov-

Globe 481–482 (Rep. Wilson); 696 (Sen. Edmunds).[16] It was, as Representative Kerr who opposed the bill instantly recognized, "against the rights of the States of this Union."

ernment . . . has no power to impose on a State officer, as such, any duty whatever," 24 How., at 107, no more "militate[s] against" the conclusion that States are "persons" for purposes of § 1983, than it militates against the conclusion that municipalities are such persons. Everyone agreed, after all, that state officers, as such, would be subject to liability for violations of § 1983. The doctrine of coordinate sovereignty, relied on in the *Prigg-Dennison-Day* line of cases, would not have distinguished between such liability and the liability of the State itself. See *Monell,* 436 U. S., at 682.

[16] A view of the reach of § 1 suggested by occasional remarks in the legislative history of H. R. 320 to the effect that "[t]he Government can act only upon individuals," Globe App. 251 (Sen. Morton), was rejected last Term when *Monell* held that municipalities were "persons" for purposes of § 1983. It was a view colored by the belief that, since a "State always acts through instrumentalities," Globe 334 (Rep. Hoar), State violations of the Fourteenth Amendment could most effectively be reached through imposing liability on the state officials through whom States acted. As Representative Burchard stated:

"In the enforcement of the observance of duties imposed directly upon the people by the Constitution, the General Government applies the law directly to persons and individual acts. It may punish individuals for interference with its prerogatives and infractions of the rights it is authorized to protect. For the neglect or refusal of a State to perform a constitutional duty, the remedies and power of enforcement given to the General Government are few and restricted. It cannot perform the duty the Constitution enjoins upon the State. If a State fails to appoint presidential electors, or its Legislature to choose Senators, or its people to elect Representatives, Congress cannot act for them. Nor do prohibitions upon States authorize Congress to exercise the forbidden power. It may doubtless require State officers to discharge duties imposed upon them as such officers by the Constitution of the United States. A State office must be assumed with such limitations and burdens, such duties and obligations, as the Constitution of the United States attaches to it. The General Government cannot punish the State, but the officer who violates his official constitutional duty can be punished under Federal law. What more appropriate legislation for enforcing a constitutional prohibition upon a State than to compel State officers to observe it? Its violation by the

Globe App. 46. Representative Shellabarger, in introducing the bill, made this explicit, stressing the need for "necessary affirmative legislation to enforce the personal rights which the

State can only be consummated through the officers by whom it acts." Globe App. 314.

It is noteworthy that, even under this view, § 1983 would abrogate the Eleventh Amendment immunity of States to the extent necessary to provide full relief for any plaintiff suing a state officer. Cf. Globe 365–366 (Rep. Arthur); 385 (Rep. Lewis); Globe App. 217 (Sen. Thurman). Thus, even if this limited approach had emerged out of concern for the Eleventh Amendment immunity of States, the distinction "between prospective relief on one hand and retrospective relief on the other," *ante,* at 337, which was drawn by *Edelman* v. *Jordan,* 415 U. S. 651 (1974), would be eliminated by the congressional enactment of § 1983. This is not anomalous, however, since the 42d Congress would have had no way to anticipate *Edelman's* distinction, and would much more probably have had in mind the decision of Mr. Chief Justice Marshall in *Osborn* v. *Bank of United States,* 9 Wheat. 738 (1824), which held:

"It may, we think, be laid down as a rule which admits of no exception, that, in all cases where jurisdiction depends on the party, it is the party named in the record. Consequently, the 11th amendment, which restrains the jurisdiction granted by the constitution over suits against States, is, of necessity, limited to those suits in which a State is a party on the record. The amendment has its full effect, if the constitution be construed as it would have been construed, had the jurisdiction of the Court never been extended to suits brought against a State, by the citizens of another State, or by aliens.

"The State not being a party on the record, and the Court having jurisdiction over those who are parties on the record, the true question is, not one of jurisdiction, but whether, in the exercise of its jurisdiction, the Court ought to make a decree against the defendants; whether they are to be considered as having a real interest, or as being only nominal parties." *Id.,* at 857–858.

Four years later the Court, again per Mr. Chief Justice Marshall, stated that a suit against the office, as opposed to the person, of the Governor of a State had the effect of making the State a party of record, *Governor of Georgia* v. *Madrazo,* 1 Pet. 110 (1828), but the essential principle remained unaltered, as evidenced by *Davis* v. *Gray,* 16 Wall. 203 (1873), a case decided two years after the Civil Rights Act of 1871:

"In deciding who are parties to the suit the court will not look beyond

Constitution guaranties, as between persons in the State and the State itself." *Id.,* at 70. See, *e. g., id.,* at 80 (Rep. Perry); Globe 375 (Rep. Lowe); 481–482 (Rep. Wilson); 568 (Sen. Edmunds). Representative Bingham elaborated the point:

> "The powers of the States have been limited and the powers of Congress extended by the last three amendments of the Constitution. These last amendments— thirteen, fourteen, and fifteen—do, in my judgment, vest in Congress a power to *protect the rights of citizens against States,* and individuals in States, never before granted.
>
> .           .           .           .           .
>
> "Why not in advance provide *against the denial of rights by States,* whether the denial be acts of omission or commission, as well as against the unlawful acts of combinations and conspiracies against the rights of the people?
>
> "The States never had the right, though they had the power, to inflict wrongs upon free citizens by a denial of

___

the record. Making a State officer a party does not make the State a party, although her law may have prompted his action, and the State may stand behind him as the real party in interest. A State can be made a party only by shaping the bill expressly with that view, as where individuals or corporations are intended to be put in that relation to the case." *Id.,* at 220.

For the legislators of the 42d Congress, therefore, an action under § 1983 directed at state officers, regardless of the effect of the suit on the State itself, would preserve the Eleventh Amendment immunity of States, so long as States themselves were not named parties. To the extent subsequent decisions of this Court have introduced an Eleventh Amendment bar to such suits when "the action is in essence one for the recovery of money from the state," *Ford Motor Co.* v. *Department of Treasury,* 323 U. S. 459, 464 (1945), this bar would be eliminated by the congressional enactment of § 1983. Since in the instant case neither the State of Illinois nor the office of the Governor of Illinois are parties "on the record," even a limited reading of the reach of § 1983 should therefore hold the Eleventh Amendment inapplicable.

the full protection of the laws; because all State officials are by the Constitution required to be bound by oath or affirmation to support the Constitution. As I have already said, the States did deny to citizens the equal protection of the laws, they did deny the rights of citizens under the Constitution, and except to the extent of the express limitations upon the States, as I have shown, the citizen had no remedy. . . . They took property without compensation, and he had no remedy. They restricted the freedom of the press, and he had no remedy. They restricted the freedom of speech, and he had no remedy. They restricted the rights of conscience, and he had no remedy. They bought and sold men who had no remedy. Who dare say, now that the Constitution has been amended, that the nation cannot by law provide against all such abuses and denials of right as these in States *and by States,* or combination of persons?" Globe App. 83, 85 (emphasis added).[17]

H. R. 320 was necessary, as Senator Edmunds stated, to protect citizens "in the rights that the Constitution gave

---

[17] Section 1 of H. R. 320 was modeled after § 2 of the Civil Rights Act of 1866, 14 Stat. 27, which imposed criminal penalties on "any person" who, "under color of any law, statute, ordinance, regulation, or custom," deprived "any inhabitant of any State or Territory" of "any right secured . . . by this act." As Representative Shellabarger stated: "That section [§ 2] provides a criminal proceeding in identically the same case as this one [§ 1] provides a civil remedy . . . ." Globe App. 68. Representative Bingham noted the limited application of the remedy provided by § 2:

"It is clear that if Congress do so provide by penal laws for the protection of these rights [guaranteed by the Fourteenth Amendment], those violating them must answer for the crime, and not the States. The United States punishes men, not States, for a violation of its law." Globe App. 85–86.

Representative Bingham was thus able to distinguish, as apparently the Court is not, *ante,* at 341 n. 11, between the reach of the word "person" in § 2 of the Civil Rights Act of 1866, and its reach in § 1 of the Civil Rights Act of 1871.

them . . . against any assault by any State or under any State or through the neglect of any State . . . ," Globe 697, and by a "State," Edmunds meant "a corporation . . . an organized thing . . . manifested, represented entirely, and fully in respect to every one of its functions, by that department of its government on which the execution of those functions is respectively devolved." *Id.*, at 696. See *id.*, at 607–608 (Sen. Pool).

It was common ground, therefore, that, as Representative Wilson argued, the prohibitions of the Fourteenth Amendment were directed against the State, meaning "the government of the State . . . the legislative, the judicial, and the executive"; that the fifth section of the Amendment had given Congress the power to enforce it by "appropriate legislation," meaning "legislation adequate to meet the difficulties to be encountered, to suppress the wrongs existing, to furnish remedies and inflict penalties adequate to the suppression of all infractions of the rights of the citizens"; and that H. R. 320 was such legislation. Globe 481–483. Those who opposed the bill were fully aware of the major implications of such a statute. Representative Blair, for example, rested his opposition on the fact that the bill, including § 1, was aimed at the States in their "corporate and legislative capacity":

> "The inhibitions in the [Thirteenth, Fourteenth, and Fifteenth] amendments against the United States and the States are against them in their corporate and legislative capacities, for the thing or acts prohibited can alone be performed by them in their corporate or legislative capacities.
>
> .          .          .          .          .
>
> "As the States have the power to violate them and not individuals, we must presume that the legislation provided for is against the States in their corporate and legislative capacity or character and those acting under their laws, and not against the individuals, as such, of the

States. I am sustained in this view of the case by the tenth section of the first article of the Constitution of the United States. In it are a number of inhibitions against the States, which it is evident are against them in their corporate and legislative capacity; and to which I respectfully call the attention of the gentlemen who favor this bill." Globe App. 208.[18]

See *id.*, at 209. This conclusion produced an anguished outcry from those committed to unrevised notions of state sovereignty. Representative Arthur, for example, complained that § 1

"reaches out and draws within the despotic circle of central power all the domestic, internal, and local institutions and offices of the States, and then asserts over them an arbitrary and paramount control as of the rights, privileges, and immunities secured and protected, in a peculiar sense, by the United States in the citizens thereof. Having done this, having swallowed up the States and their institutions, tribunals, and functions, it leaves them the shadow of what they once were." Globe 365.

The answer to such arguments was, of course, that the Civil War had irrevocably and profoundly altered the balance of power between Federal and State Governments:

"If any one thinks it is going too far to give the United States this national supervisory power to protect the fundamental rights of citizens of the United States, I do not agree with him. It is not wise to permit our devotion to the reserved rights of the States to be carried so far as to deprive the citizen of his privileges and immunities.

"We must remember that it was State rights, perverted I admit from their true significance, that arrayed them-

---

[18] Representative Blair reached this conclusion after reasoning that if the bill were interpreted as applicable only to individuals, it would not be able to fulfill the purposes of the Reconstruction Amendments.

selves against the nation and threatened its existence. We must remember that it was for the very purpose of placing in the General Government a check upon this arrogance of some of the States that the fourteenth amendment was adopted by the people. We must remember that, if the legislation we propose does trench upon what have been, before the fourteenth amendment, considered the rights of the States, it is in behalf and for the protection of immunities and privileges clearly given by the Constitution; and that Federal laws and Federal rights must be protected whether domestic laws or their administration are interfered with or not, because the Constitution and the laws made in pursuance thereof are the supreme law of the land. We are not making a constitution, we are enacting a law, and its virtue can be tested without peril by the experiment." *Id.*, at 502 (Sen. Frelinghuysen).

In the reconstructed union, national rights would be guaranteed federal protection even from the States themselves.

### III

The plain words of § 1983, its legislative history and historical context, all evidence that Congress intended States to be embraced within its remedial cause of action. The Court today pronounces its conclusion in dicta by avoiding such evidence. It chooses to hear, in the eloquent and pointed legislative history of § 1983, only "silence." Such silence is in fact deafening to those who have ears to listen. But without reason to reach the question, without briefs, without argument, relying on a precedent that was equally ill-informed and in any event not controlling, the Court resolutely opines that a State is not a "person" for purposes of § 1983. The 42d Congress, of course, can no longer pronounce its meaning with unavoidable clarity. *Fitzpatrick*, however, cedes to the

present Congress the power to rectify this erroneous misinterpretation. It need only make its intention plain.

MR. JUSTICE MARSHALL, concurring in the judgment.

I concur in the judgment of the Court, for the reasons expressed in my dissenting opinion in *Edelman* v. *Jordan*, 415 U. S. 651, 688 (1974), and my concurring opinion in *Employees* v. *Missouri Public Health Dept.*, 411 U. S. 279, 287 (1973). Moreover, I agree that an affirmance here follows logically from the Court's decision in *Edelman*, because the explanatory notice approved by the Court of Appeals clearly is ancillary to prospective relief. But given that basis for deciding the present case, it is entirely unnecessary for the Court to address the question whether a State is a "person" within the meaning of § 1983. Accordingly, I join Parts I, II, and III of my Brother BRENNAN's opinion.