**Pat DOE, Plaintiff,**

v.

**The JUDICIAL NOMINATING COMMISSION FOR the FIFTEENTH JUDICIAL CIRCUIT OF FLORIDA, Defendant.**

**No. 95–8625–CIV.**

United States District Court,
S.D. Florida.

Nov. 13, 1995.

Nunc Pro Tunc Nov. 9, 1995.

James K. Green, West Palm Beach, Florida, Susan Stefan, Coral Gables, Florida, for Plaintiff.

Elaine Thompson, Assistant Attorney General, West Palm Beach, Florida, for Defendant.

### ORDER GRANTING PRELIMINARY INJUNCTION

HURLEY, District Judge.

Florida state trial judges are either elected or appointed. When a judicial vacancy occurs between elections, the governor, pursuant to state constitutional mandate, initiates a selection process in which a judicial nominating commission ("JNC") solicits and reviews applicants, and then submits at least three nominees to the governor. Plaintiff is an attorney who responded to a public solicitation from the JNC for the Fifteenth Judicial Circuit. After reviewing the JNC's application form, plaintiff filed this action for injunctive and declaratory relief, asserting that a series of questions concerning physical and mental health violate the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* For the reasons described below, the

court concludes that the disputed questions are overinclusive and, therefore, violate the ADA. Consequently, the JNC is enjoined from utilizing the disputed questions or the answers given in response thereto.

## I. FACTS

When a vacancy occurred on the Circuit Court for the Fifteenth Judicial Circuit (Palm Beach County), the Governor of Florida directed the JNC for this circuit to initiate an advertising and screening process as required by the Uniform Rules of Procedure for Circuit Judicial Nominating Commissions ("Uniform Rules"). Section 1 of these rules provides that the JNC "shall actively seek, receive and review the approved background statements submitted by those who voluntarily request consideration...." Uniform Rules, § I. It further provides that the JNC "shall require completion of the application form attached hereto ... which shall include a waiver of confidentiality of all material necessary to adequately investigate each applicant." *Ibid.*

The goal of the JNC is to ensure that each nominee recommended to the Governor "meets all constitutional and statutory requirements and is fit for appointment...." Uniform Rules, § IV. The constitutional and statutory standards for nomination to the office of circuit judge are that the nominee be a member of the bar for at least five years, an elector (registered voter) of the State of Florida, and a resident of the territorial jurisdiction of the court. Fla. Const. art. V, § 8; *see* Instructions for Application for Nomination for Judgeship. Fitness is defined as, but not limited to, personal attributes such as integrity, sobriety, moral conduct, competency, and expertise; and judicial attributes such as patience, decisiveness, industry, and ability to handle judicial power. Uniform Rules, § IV.

The JNC application form was formulated to gather relevant information to facilitate the screening process. Plaintiff, however, contends that questions 10–13, which concern an applicant's physical and mental health, violate the ADA. The questions are as follows:

10. What is the present state of your health?

11. Do you have any impairment of eyesight, hearing, or other debilitating handicap or disease? If so, please describe.

12. Have you had any hospital confinement, or serious physical illness during the past five years? If yes, give details and identify your attending physician(s), the name(s) of any hospital(s) or other institution(s) to which you were admitted if any and the date(s) of hospitalization(s).

13(a). Have you ever been treated for or suffered from any form of mental illness? If so, give details including names and addresses of treating physicians, psychologists, and/or hospitals, or other facilities involved including dates of treatment or confinement.

13(b). Have you been treated for or suffered from any form of emotional disorder or disturbance or otherwise been treated by psychologists, psychiatrists or other mental health care professionals, in the last five years? If so, give details including names and addresses of those persons in institutions consulted or providing treatment including dates of treatment.

13(c). Have you ever been addicted to or dependent upon alcoholic beverages or any other drug? If so, give dates of use or dependency and describe treatment, if any, giving names of physicians and other persons furnishing treatment.

Every applicant is required to answer these questions completely and truthfully. Furthermore, the applicant must sign a certificate that provides for release of "any information, files, [or] records" requested by the JNC with the understanding that all information received "shall be open to the public." Application, at 16. This disclosure requirement derives from the state constitutional provision creating the JNC and from Florida's commitment to conduct its business

in the sunshine. *See* Fla. Const. art. V, § 11(d); Uniform Rules, § III.

Plaintiff's complaint alleges that he or she resides in Palm Beach County, is an elector of the State of Florida, and is a lawyer of more than twenty years membership in the Florida Bar. By affidavit filed under seal to protect plaintiff's privacy, plaintiff alleges facts which indicate a history of suffering and/or having been treated for various mental, physical, and emotional conditions.

## II. ANALYSIS

Experts in the field have suggested that "[d]isability is not really the cause of an undignified, harsh life. The real cause is lack of access to buildings, jobs, transportation; segregation and denial of services." Mary Johnson, *Jerry's Kids,* THE NATION, Sept. 14, 1992, at 232. Congress, recognizing the truth of this assertion, took a monumental step toward ending such discrimination by enacting the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101, *et seq.* The underlying premise to this legislation is that it is preferable to provide access to opportunities rather than to "take care of" people with disabilities. *See generally* Robert L. Mullen, *The Americans With Disabilities Act: An Introduction for Lawyers and Judges,* 29 Land & Water L.Rev. 175 (1994). The Act's goal is to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). So strong was Congress's commitment to achieving this goal, that in addition to relying on its Commerce Clause power, it expressly invoked its authority to enforce the Fourteenth Amendment. 42 U.S.C. § 12101(b)(4). As will be seen hereafter, this power has special significance to the case at bar.

Title II of the Americans with Disabilities Act prohibits discrimination against disabled persons by public entities. 42 U.S.C. §§ 12131–50. It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity or be subject to discrimination by any such entity." 42 U.S.C. § 12132. A "public

entity" is defined as "any department, agency ... or other instrumentality of a State...." 42 U.S.C. § 12131(1)(B).

As defined by the ADA, "discrimination" includes, *inter alia,* "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." 42 U.S.C. § 12112(b)(5)(A). "[O]therwise qualified" means that the individual, "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8).

### A. Standing

■ As an initial consideration, the JNC questions plaintiff's standing. To have standing under the ADA, a plaintiff must be a "qualified individual with a disability." 42 U.S.C. § 12131(2); 28 C.F.R. § 35.130(a). The complaint establishes that plaintiff satisfies the constitutional requirements for appointment to the circuit court. In addition, the affidavit, filed under seal, establishes that plaintiff has, or will be perceived as having had, a disability. Furthermore, case law establishes that a plaintiff need not be rejected by a governmental screening authority to have standing to contest potentially overinclusive questions. *See Clark v. Virginia Board of Bar Examiners,* 880 F.Supp. 430, 442 (E.D.Va.1995); *Ellen S. v. Florida Board of Bar Examiners,* 859 F.Supp. 1489, 1494 (S.D.Fla.1994). Thus the court finds that plaintiff Doe has standing to bring this action.

### B. Tenth Amendment

■ The JNC, represented by the Florida Attorney General, contends that the Tenth Amendment to the U.S. Constitution precludes application of the ADA to any part of the process for selecting state judges. In making this argument, the JNC does not suggest that it is free to discriminate. To the contrary, Governor Chiles, both in person

and through his counsel, has repeatedly affirmed Florida's commitment to eradicating all forms of discrimination in the judicial selection process. The JNC simply contends that the selection of state judges is a traditional sovereign function upon which Congress cannot intrude and upon which, in fact, Congress did not intend to intrude.

The JNC predicates its argument on two cases: *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991); and *Pennhurst State School & Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). Both cases address the difficult issue of the proper balance between federal/state power. The question in *Gregory* was whether a state law requiring judges to retire at age 70 violated the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. §§ 621–634. Acknowledging that the state had a paramount interest in establishing the qualifications for its judges, the Court ruled that "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.'" *Gregory,* 501 U.S. at 460, 111 S.Ct. at 2401 (quoting *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985)). Because Congress failed to make its intention clear, the Court held that the Act did not apply to state judges. "We will not read the ADEA to cover state judges unless Congress had made it clear that judges are *included.*" *Id.,* 501 U.S. at 466, 111 S.Ct. at 2404. At the same time, the Court noted "that the principles of federalism that constrain Congress' exercise of its Commerce Clause powers are attenuated when Congress acts pursuant to its powers to enforce the Civil War Amendments.... This is so because those 'Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty.'" *Id.,* at 468, 111 S.Ct. at 2405 (quoting *City of Rome v. United States,* 446 U.S. 156, 179, 100 S.Ct. 1548, 1563, 64 L.Ed.2d 119 (1980)).

The question in *Pennhurst* was whether the Congress, by enacting the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 42 U.S.C. § 6000 *et seq.,* intended to create substantive rights that were binding on the states. The Court ruled in the negative, finding that the Act was "a mere federal-state funding statute." *Pennhurst,* 451 U.S. at 17, 101 S.Ct. at 1540. This decision was aided by the fact that Congress had not expressly invoked its Fourteenth Amendment power. The court stated, "[W]e have had little occasion to consider the appropriate test for determining when Congress intends to enforce those guarantees [under the Fourteenth Amendment]. Because such legislation imposes congressional policy on a State involuntarily, and because it often intrudes on traditional state authority, we should not quickly attribute to Congress an unstated intent to act under its authority to enforce the Fourteenth Amendment." *Id.,* at 15, 101 S.Ct. at 1539.

Unlike the statutes involved in *Gregory* and *Pennhurst,* the ADA was promulgated expressly under Congress' Fourteenth Amendment powers. *See* 42 U.S.C. § 12101(b)(4); U.S. Const. amend. XIV, § 5. Yet, as noted in *Gregory,* "this Court has never held that the [Fourteenth] Amendment may be applied in complete disregard for a State's constitutional powers. Rather, the Court has recognized that the States' power to define the qualifications of their officeholders has force even as against the proscriptions of the Fourteenth Amendment." *Gregory,* 501 U.S. at 468, 111 S.Ct. at 2405. Thus the precise question posed by this case is whether a screening process, initiated by a state judicial nominating commission, to review and recommend nominees for appointment to the bench is so closely related to the state's sovereignty that it should be immune from federal antidiscrimination legislation.

■ Case law analyzing Congress' commerce clause power reveals the difficulty of pinpointing "integral" or "traditional" state governmental functions. *Compare National League of Cities v. Usery,* 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976), *with Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). "We therefore now reject, as unsound in principle and unworkable in practice," a rule of state immunity

from federal regulation that turns on a judicial appraisal of whether a particular governmental function is "integral" or "traditional." *Garcia,* 469 U.S. at 546, 105 S.Ct. at 1015. In the final analysis, the decision in the case at bar must turn on Congress' expressed intent and an evaluation of the impact of the federal legislation upon the state. Eliminating discrimination in the selection of state judges is inclusive and beneficial. It broadens the selection of applicants from which the Governor will ultimately choose, and it enhances public confidence in the integrity of the selection process. Thus, the court concludes that the Tenth Amendment is not a barrier to applying the ADA to this phase of the state's judicial selection process. In short, the JNC is a "public entity" within the meaning of the ADA and is subject to its provisions. *See* 42 U.S.C. § 12131(1)(B).

### C. Regulations

■ Title 42 U.S.C. § 12134(a) authorizes the Attorney General to issue regulations to implement Title II of the ADA. Title 28 C.F.R. § 35.130 was promulgated pursuant to this authority. It states:

> "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of that service, program, or activity being offered."

28 C.F.R. § 35.130(b)(8). Thus, public entities cannot use eligibility criteria that screen out, or tend to screen out, individuals with disabilities *unless the criteria are necessary.* Under this "necessity exception," public entities may utilize eligibility criteria that screen out, or tend to screen out, individuals with disabilities if the criteria are necessary to insure the safe operation of the program or if the individual "poses a direct threat to the health or safety of others." 28 C.F.R. pt. 35, app. A, at 455 (1995).

■ Regulations promulgated under Title II of the ADA are entitled to "substantial deference." *Helen L. v. DiDario,* 46 F.3d 325, 331 (3d Cir.), *cert. denied sub nom.,*

*Pennsylvania Secretary of Public Welfare v. Idell,* —— U.S. ——, 116 S.Ct. 64, —— L.Ed.2d —— (1995) ("[T]he interpretation of [the] agency charged with the administration of [the ADA] is entitled to substantial deference.") "[C]onsiderable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Unless the regulations are "arbitrary, capricious or manifestly contrary to the statute," the agency's regulations are "given controlling weight." *Chevron, U.S.A., Inc.,* 467 U.S. at 844, 104 S.Ct. at 2782.

### D. Necessity Exception

Neither party to this suit contends the regulations are arbitrary or capricious. Nor does the JNC deny that the disputed questions inquire about an applicant's disabilities. The JNC, however, asserts that the questions are justified by the "necessity exception" to the Department of Justice's regulations. The JNC argues that judges are vested with tremendous power, the exercise of which requires a wide range of cognitive skills and physical endurance. Consequently, the JNC asserts that considerations of public safety demand that judicial applicants be subjected to the most thorough scrutiny to insure that they possess the requisite mental and physical ability. Plaintiff, on the other hand, contends that no questions may be asked about physical or mental status before a conditional offer of employment is extended. As a backup position, plaintiff asserts that only questions asking about *behavior* (e.g., "Have you ever been absent from work for 30 days or longer?"), as opposed to status (e.g., "Have you ever been diagnosed as having a psychosis?"), are permissible. Next, plaintiff contends that if questions about status are permissible, they must be framed in terms of whether the *applicant* believes he or she is suffering from any physical or mental disability which would impact on his or her ability to perform the job. Finally, plaintiff asserts that the status

questions on the JNC application are overinclusive.

■ Judges in our society are vested with extraordinary power. Decisions of life and death, liberty or imprisonment, custody of children, and a host of other weighty issues constitute the daily diet of those who serve on the bench. It is absolutely imperative that applicants for these positions be thoroughly vetted to assure their physical and mental fitness. The Florida Constitution places a large part of this responsibility in the hands of the JNC. As the gate keepers of the appointive route to the bench, the commission's task is to invite the best to apply, to scrutinize the applicants, and then to nominate only the most qualified for the governor's consideration. Protecting the public is a paramount goal and, therefore, the court agrees with the JNC's contention that the "necessity exception" is applicable to the judicial selection process.

The decision in *Applicants v. Texas State Board of Law Examiners*, 1994 WL 776693 (W.D.Tex. Oct. 11, 1994), provides useful guidance. Citing the ADA, applicants for admission to the Texas bar challenged a question on the state bar application about their mental health. The disputed question asked about diagnosis of certain specified mental illnesses such as bipolar disorder or paranoia that might bear on an applicant's present fitness to practice law. The court found that the bar examiners were entitled to ask narrowly focused status questions under the regulations' necessity exception. The court reasoned, "[w]hen, as in this case, questions of public safety are involved, the determination of whether an applicant meets 'essential eligibility requirements' involves consideration whether the individual with a disability poses a direct threat to the health and safety of other." *Id.* at *5. Commenting further on the public safety aspects of the Board of Examiners inquiry, the court observed:

> The Board has a duty not to just the applicants, but also to the Bar and the citizens of Texas to make every effort to ensure that those individuals licensed to practice in Texas have the good moral character and present fitness to practice

> law and will not present a potential danger to the individuals they will represent. The Board has a limited opportunity to accomplish this task—the time of the filing of the declaration and application. The Board, therefore, must make every effort to investigate each applicant as thoroughly as possible and as efficiently as possible during this limited time.... The rigorous application procedure, including investigating whether an applicant has been diagnosed or treated for certain serious mental illnesses, is indeed necessary to ensure that Texas' lawyers are capable, morally and mentally, to provide these important services.

*Id.* at *8. These considerations are all the more important when it comes to evaluating applicants for judicial office. Accordingly, the court concludes that the JNC is justified by the regulation's necessity exception in utilizing reasonable, narrowly-drawn eligibility criteria which screen out, or tend to screen out, individuals with a disability.

### E. Other Contentions

■ In reaching this conclusion, the court has rejected plaintiff's primary contention that the JNC is prohibited by the ADA from asking any questions about mental and physical fitness before a conditional offer of employment is tendered. Similarly, the court rejects plaintiff's contention that questions must be limited to behavior rather than status. Plaintiff's argument on this last point has been restated in a recent law review note as follows.

> The essential problem with [psychological background] questions is that they substitute an impermissible inquiry into the status of disabled applicants for the proper, indeed necessary, inquiry into the applicants' behavior. In the context of other antidiscrimination statutes, it has been held to be fundamental that an individual's status cannot be used to make generalizations about that individual's behavior.

Carol J. Banta, Note, *The Impact of the Americans With Disabilities Act on State Bar Examiners' Inquiries into the Psychological History of Bar Applicants,* 94 Mich. L.Rev. 167, 186 (1995) (quoting *Medical Soci-*

*ety v. Jacobs,* 1993 WL 413016, at *7 (D.N.J. Oct. 5, 1993)). Again, the decision in *Texas Applicants* is instructive. The court relied upon expert testimony which indicated that "a direct mental health inquiry ... is necessary in the licensing process to get a full understanding of the functional capacity of the applicant's mental fitness." *Texas Applicants,* 1994 WL 776693, at *7. Thus, the court concluded that "the ADA does not preclude a licensing body from any inquiry and investigation related to mental illness, instead allowing for such inquiry and investigation when they are necessary to protect the integrity of the service provided and the public." *Id.* at *8. The same conclusion was drawn by the court in *Clark v. Virginia Board of Bar Examiners,* 880 F.Supp. 430 (E.D.Va.1995). Characterizing the mental health question as overinclusive, the court left the door open for a more narrowly-drawn question about status. "While certain severe mental or emotional disorders may pose a direct threat to public safety, the Board has made no individualized finding that obtaining evidence of mental health counseling or treatment is effective in guarding against this threat." *Id.* at 446. Like its sister courts in *Clark* and *Texas Applicants,* this court holds that the ADA does not prevent inquiry into an applicant's status, i.e., diagnosis or treatment for severe mental illness.

■ Plaintiff's contention that questions must be phrased in terms of whether the *applicant* believes he or she has a mental or physical disability which would prevent the applicant from discharging the responsibilities of the position is rejected also. This court concurs with the reasoning in the *Texas Applicants* case where the court stated, "[S]elf-disclosure-type questions suffer, possibly to a greater degree, from some of the same defects the plaintiffs criticize in the current question—those who answer untruthfully or who do not recognize or understand the nature and extent of their illness will not be identified." *Id.* at *7.

### F. Overinclusiveness

■ Plaintiff's final contention is that the JNC's questions are overinclusive, *i.e.,* they require disclosure of information about past treatment or counseling that has no bearing on the applicant's present ability to perform the job. Plaintiff contends that the disclosure of this information will stigmatize and subject plaintiff to additional impermissible burdens. To evaluate this claim, one must bear in mind "the overarching purpose of the ADA: to eliminate the stigma and stereotypes associated with disability and to eradicate discrimination on the basis of such stereotypes." *Banta, supra,* at 177. "The point of the bill is to start breaking down those barriers of fear and prejudice and unfounded fears, to get past that point so that people begin to look at people based on their abilities, not first looking at their disability." *Id.* at 178 (quoting Senator Tom Harkin, ADA sponsor). Congress spoke to this point when it found that

> [I]ndividuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society....

42 U.S.C. § 12101(a)(7). That such feelings persist in society is attested to by the comments of Michael B. Laudor, an attorney with schizophrenia, a major disabling mental illness. With the aid of medication, he gained sufficient control over his illness to attend, graduate and then do post-doctoral work at law school. Recently, Laudor commented, "Some people at Yale Law School told me not to tell anyone because mental illness is a career killer.... They won't let you work in law firms, they won't let you work as a professor." Lisa W. Foderaro, *A Voyage Into Bedlam and Part Way Back,* N.Y. Times, November 9, 1995, at A16.

To achieve its goal of eliminating discrimination against individuals with disabilities, Congress fashioned a broadly inclusive category of individuals who are entitled to protection under the ADA. The Act prohibits discrimination against individuals on the ba-

sis of a mental or physical disability, a history of such a disability, or being regarded as having such a disability. 42 U.S.C. § 12102(2). The last category was drawn from the Rehabilitation Act of 1972, 29 U.S.C. § 701 *et seq.*, which Congress amended to provide protection to individuals who are simply "regarded as having" a physical or mental impairment. *See* 29 U.S.C. § 794. In so doing, "Congress acknowledged that society's accumulated myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairment." *School Board v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 1129, 94 L.Ed.2d 307 (1987) (citations omitted).

With this background in mind, we turn again to plaintiff's contention that the JNC's questions violate the ADA because they are overinclusive. Plaintiff argues that he or she will be stigmatized and unduly burdened if forced to disclose counseling or treatment for matters which have nothing to do with job performance but which might cause plaintiff to be regarded by others as having suffered from a disability. A hypothetical example illustrates the point. If plaintiff, as a child, had been psychologically abused by an alcoholic parent and thereafter, as an adult, sought counseling or therapy to resolve lingering vestiges from this problem, that treatment would have to be disclosed in response to question 13(b). Plaintiff asserts that disclosure of this type of information is neither justified nor required by the necessity exception. Further, plaintiff contends that such disclosure will demean plaintiff in the eyes of the JNC, plaintiff's clients, and the public. Plaintiff underscores the argument by noting that the JNC application warns applicants that all information provided will be treated as public record. Indeed, the Florida Constitution states, "Except for deliberations of the judicial nominating commissions, the proceedings of the commissions *and their records* shall be open to the Public." Fla. Const. art. V, § 11(d).

An emerging body of case law has dealt with similar challenges, albeit in the context of applications for membership in state medical and bar associations. In *Medical Society of New Jersey v. Jacobs,* 1993 WL 413016 (D.N.J. Oct. 5, 1993), the court ruled that the ADA prohibited a state board of medical examiners from asking whether an applicant had "ever suffered or been treated for any mental illness or psychiatric problems." *Id.* at *1. The court concluded that the questions were overinclusive because "many, if not the vast majority, of the applicants who answer "yes" to one of the challenged questions are nevertheless qualified to hold a medical license by reason of the applicant's character, training, and experience." *Id.* at *8. Ultimately, the court opted for a behavior-based test. It concluded that "[t]he essential problem with the present questions is that they substitute an impermissible inquiry into the status of disabled applicants for the proper, indeed necessary, inquiry into the applicants' behavior." *Id.* at *7.

In *Ellen S. v. Florida Board of Bar Examiners,* 859 F.Supp. 1489 (S.D.Fla.1994), former Chief Judge King denied the board's motion to dismiss, holding that the Tenth Amendment was not a bar to applying the ADA to the licensing or certification of attorneys. The Florida Bar thereafter entered into a consent decree and voluntarily changed the disputed questions. The Supreme Judicial Court of Maine followed the reasoning of *Jacobs* and disallowed the bar examiners' questions about diagnoses and treatment of amnesia, emotional disturbances, and nervous or mental disorders. *See In re Application of Underwood,* 1993 WL 649283 (Me. Dec. 7, 1993).

The two most recent cases to address this issue on the merits are *Clark v. Virginia Board of Bar Examiners,* 880 F.Supp. 430 (E.D.Va.1995) and *Applicants v. Texas State Board of Law Examiners,* 1994 WL 776693 (W.D.Tex. Oct. 5, 1994). *Clark* dealt with the following question posed to bar applicants: "Have you within the past five (5) years been treated or counseled for *any* mental, emotional or nervous disorders?" *Id.* at 431. The court began by finding that the state's licensing process for lawyers is subject to the ADA. Accepting the proposition that "an attorney's uncontrolled and untreated mental or emotional illness may result in injury to clients and the public," the court agreed that "at some stage in the application proceeding,

some form of mental health inquiry is appropriate." *Id.* at 436. The critical question was what form of inquiry was permissible? The court declined to provide a specific example, but offered the following guidance.

[The question] is too broad and should be rewritten to achieve the Board's objection of protecting the public. [The] broadly worded mental health question discriminates against disabled applicants by imposing additional eligibility criteria. While certain severe mental or emotional disorders may pose a direct threat to public safety, the Board has made no individualized finding that obtaining evidence of mental health counseling or treatment is effective in guarding against this threat.

*Id.* at 446. Despite being unwilling to redraft the question, the *Clark* court expressed its preference for questions more directly related to specific behavioral disorders. *Id.* at 444 (citing cases).

In *Applicants v. Texas State Board of Law Examiners,* 1994 WL 776693 (W.D.Tex. Oct. 11, 1994), as discussed above, the court concluded that an applicant's treatment records furnished important information on "the applicant's insight into his or her illness and degree of cooperation in controlling it." *Id.* at *3.. Merely looking to past behaviors, the court said, was not a sufficiently exact and reliable method for ascertaining mental fitness. Thus the court concluded that some inquiry into past diagnosis and treatment of specified mental illnesses was necessary to provide "the best information available with which to assess the functional capacity of the individual." *Id.*

In reaching this conclusion, the court in *Texas Applicants* paid particular attention to balancing the congressional goals of preventing discrimination against the disabled and integrating the disabled into society with the countervailing goal of protecting the public from harm at the hands of persons holding a public trust. The court noted that the Board of Law Examiners had an "awesome responsibility" because of the duty not just to applicants but to the citizens of Texas. *Id.* at *8. This public duty arises because "lawyers serve the important role in our society of assisting people in the management of the most important of their affairs." *Id.* at *8. Accordingly, the court concluded that:

The Board would be derelict in its duty if it did not investigate the mental health or prospective lawyers. It has made every effort to do so in the least intrusive, least discriminatory manner possible, focusing on only those serious mental illnesses that experts have indicated are likely to affect present fitness to practice law. It has limited the inquiry to a specified time frame, primarily spanning late adolescence and adult life. Although affirmative answers do trigger investigation that applicants answering negatively do not have to undergo, the affirmative answer does not result in an immediate denial of a license to practice law. The ensuing investigation serves two purposes: protection of the Bar and the public as well as an opportunity for the applicant to indicate present fitness.

*Id.* at *9. These guidelines should assist the JNC as well.

■ All of these cases reinforce the principle that, under the ADA, the forced disclosure of information relating to disabilities without a necessary basis for the information is a form of discrimination because it screens out, or tends to screen out, the disabled by imposing disproportionate burdens on them. With this in mind, let us turn again to the disputed questions in this case. Questions 10 and 11 probe physical health without being clearly related to job performance. For example, as now framed they would elicit intimate and non-essential details on reproductive disabilities which are certainly not job-related and which, because of the process, would become public record.

■ The inquiry into "*any* hospital confinement" [question # 12], "*any* form of mental illness" [question # 13(a) ], "*any* form of emotional disorder or disturbance" [question 13(b) ], vividly demonstrates the overinclusiveness of the mental health questions. As presently framed, these questions will force the disclosure of intimate, personal matters that have nothing to do with job performance. For example, questions 12 and 13 lack limitations that would exclude hospital-

ization or treatment resulting from personal traumas such as childhood sexual abuse or loss of a loved one. Question 13 may also require disclosure of family counseling. How such events and conditions could possibly be considered reasonably related to an individual's capacity to perform as a judge eludes this court. Question 13(c), which deals with treatment for drug and alcohol addiction, has a similar problem and requires special treatment in light of 42 U.S.C. § 12210. Recent history in South Florida teaches the tragic lesson that drug addiction can render a judicial officer vulnerable to corruption and breach of the public trust. Consequently, concerns for public safety, embodied in the necessity exception, justify inquiry into this area. But at minimum, the inquiry must be subject to reasonable time limitations which are absent here. All of the disputed questions, as presently framed, force the disclosure of information which is not necessary to protect the public safety and, therefore, go beyond that justified by the necessity exception. The exception must be read narrowly to further the remedial purpose of the statute. Therefore, where the inquiry has no reasonable relationship to job performance, but imposes a burden on individuals with disabilities by requiring them to make public disclosure of irrelevant present, past or perceived disabilities, the inquiry violates the ADA.

### G. Injunctive Relief

Plaintiff seeks a preliminary injunction which is an extraordinary remedy. *Compact Van Equip. Co., Inc. v. Leggett & Platt, Inc.,* 566 F.2d 952, 954 (5th Cir.1978). Indeed, it has been described as a "drastic remedy." *Crochet v. Housing Authority of City of Tampa,* 37 F.3d 607, 610 (11th Cir. 1994). "To satisfy the requirements for a preliminary injunction, the movant must establish: (1) a substantial likelihood of succeeding on the merits; (2) a substantial threat of irreparable injury if relief is denied; (3) an injury that outweighs the opponent's potential injury if relief is granted; and (4) an injunction would not harm the public interest." *Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994), *cert. denied,* —— U.S. ——, 116 S.Ct. 337, ——

L.Ed.2d —— (1995). Moreover, "[w]here, as here, mandatory relief is sought, as distinguished from maintenance of the status quo, a strong showing of irreparable injury must be made, since relief changing the status quo is not favored unless the facts and law clearly support the moving party." *Doe v. New York University,* 666 F.2d 761, 773 (2d Cir. 1981).

As discussed above, the court has concluded that the plaintiff has established a substantial likelihood of ultimately prevailing on the merits. The remaining criteria for issuance of a preliminary injunction have been satisfied also. Discrimination on the basis of disability is the type of harm that warrants injunctive relief. *See D'Amico v. New York State Board of Law Examiners,* 813 F.Supp. 217, 220 (W.D.N.Y.1993); *see also Spiegel v. City of Houston,* 636 F.2d 997 (5th Cir.1981) (defining irreparable injury as one that cannot be undone through monetary damages). The third prong of the test for a preliminary injunction is also met because no damage ensues to the JNC in abiding by the ADA. Finally, the fourth prong is met because the public interest requires that discrimination against the disabled not be tolerated.

### III. DECRETAL PROVISIONS

Accordingly, it is **ORDERED** and **ADJUDGED** as follows:

1. The Judicial Nominating Commission for the Fifteenth Judicial Circuit of Florida is herewith enjoined, now and in the future, from requiring applicants for judicial vacancies to respond to questions 10 through 13(c), as set forth in this opinion.

2. The Judicial Nominating Commission for the Fifteenth Judicial Circuit of Florida is enjoined from exercising the current medical records release obtained from all applicants as part of the certificate.

3. The Judicial Nominating Commission for the Fifteenth Judicial Circuit of Florida is enjoined from utilizing or releasing to the public the answers obtained from any present or future applicant in response to questions 10 through 13(c).

4. This court shall retain jurisdiction over the parties to provide expedited review should there be a challenge to any redrafted question.