Robert **SAUNDERS**

v.

Commissioner Martin **HORN, et al.**

Civil Action No. 95–7844.

United States District Court,
E.D. Pennsylvania.

March 27, 1997.

894

Robert Saunders, Georgetown, DE, pro se.

Beth Anne Smith, Office of Attorney General, Philadelphia, PA, for Defendants.

### ORDER

LOUIS A. POLLAK, District Judge.

After consideration of the defendants Horn and Vaughn's motion to dismiss and the documents related thereto, after review of the Report and Recommendation of Diane M. Welsh, United States Magistrate Judge, and after reviewing defendants' objections to the Report, it is hereby ORDERED that:

1. The Report and Recommendation is APPROVED and ADOPTED;

2. The defendants' motion to dismiss is GRANTED with respect to the plaintiff's right-to-court-access claim and equal protection claim;

3. The defendants' motion to dismiss is DENIED with respect to the plaintiff's Eighth Amendment claim, procedural due process claim and Americans with Disabilities Act claim; and

4. The defendants' motion to dismiss is CONVERTED into a motion for summary judgment with respect to the plaintiff's prayer for injunctive relief, and the defendants are GRANTED summary judgment with respect to the prayer for injunctive relief.

### OPINION

This is a civil rights case, pursuant to 42 U.S.C. § 1983, in which a prisoner, Robert Saunders, alleges that Martin Horn, the Commissioner of Pennsylvania's Department of Corrections, Donald T. Vaughn, the Superintendent of SCI–Graterford, and three corrections officers deprived him of various constitutional rights and his rights under the Americans with Disabilities Act. Before the court is a motion to dismiss the complaint for failure to state a claim against defendants Horn and Vaughn. On December 23, 1996, Magistrate Judge Diane M. Welsh issued a Report and Recommendation, in which she recommended that "defendants' motion to dismiss be granted with respect to the plain-

tiff's right-to-court-access claim and equal protection claim"; that "the defendants' motion to dismiss be denied with respect to the plaintiff's Eighth Amendment claim, procedural due process claim and Americans with Disabilities Act claim"; and that "the defendants' motion to dismiss be converted into a motion for summary judgment with respect to the plaintiff's prayer for injunctive relief and that the defendants be granted summary judgment with respect to the prayer for injunctive relief."

Horn and Vaughn have filed objections to the portions of the Report recommending that portions of their motion to dismiss be denied. I will address their arguments that Saunders' complaint should be dismissed because (1) he failed to allege facts showing that Horn and Vaughn were personally involved in the alleged wrongdoing, and (2) the Americans with Disabilities Act does not apply to state prisons.

## I.

Accepting the factual allegations in the complaint as true for the purposes of the 12(b)(6) motion, Judge Welsh recited the facts as follows:

The plaintiff has been serving a life sentence since April 1976. Since 1984, he has been wearing orthopedic shoes and walking with the aid of a cane. These items were prescribed by an orthopedist. In early 1995, an MRI revealed that he was "suffering from disk degeneration in areas of L–5, S–5 ... of spine." On September 22, 1995, the plaintiff was transferred from a Delaware prison to SCI–Camphill. Upon arriving at SCI–Camphill, an official of that prison took away the plaintiff's orthopedic shoes and his brace.[1] The plaintiff was told that, if these items were needed, a doctor at SCI–Camphill would order them. Since that time, he has had

to "wear regularly issued shoes, which cause him constant pain."

On November 22, 1995, the plaintiff was transferred to SCI–Graterford. Upon his arrival, defendant Harmon placed him in a cell with an inmate who had been placed in disciplinary status for assaulting a correctional officer. On November 28, 1995, he was informed by the Program Review Committee that he should be assigned into the general population. He told defendants Thomas and Murphy of this information but they left him in the same cell, where he was locked in 24 hours a day and fed in the cell. In spite of his physical condition, he was required to climb onto the top bunk.

On December 1, 1995, the plaintiff was assigned a new cellmate. This new cellmate had been sentenced by the Disciplinary Committee to cell restriction. The plaintiff was only permitted to leave his cell to receive his medication and to shower once every three days. Prior to December 1, 1995, the plaintiff had only had one cold shower.

The plaintiff complained to defendants Murphy, Harmon and Thomas about being kept locked in his cell 24 hours a day. He informed them that he had not violated any disciplinary rules prior to leaving SCI–Camphill. His grievances were ignored and he then wrote letters to defendants Horn and Vaughn.

On December 6, 1995, he was taken to a different cell and he was afforded some privileges, which he does not specify. He was not, however, given an identification card, which prevented him from borrowing law books from the law library. Although he had litigation pending in Delaware before he came to Pennsylvania, the plaintiff was unable to use the available law books and Commissioner Horn failed to provide him with Delaware law books. For rea-

---

1. Judge Welsh continued in a footnote:

It is not clear whether the plaintiff meant to refer to his cane rather than to a brace. In the complaint he says his brace, not his cane, was taken from him. However, at no part of his complaint does he allege that he had been prescribed a brace for his condition. To further confuse matters, in the last paragraph of

his factual allegations, the plaintiff complains that he is forced to go through the food line, while carrying his tray, juice and while walking with a cane. This would suggest either that the SCI–Camphill official did not seize his cane or that the plaintiff obtained a new cane at some point after his arrival at SCI–Camphill.

sons which he does not explain, he had to be accompanied by a correctional officer in order to pick up his legal mail. This meant that, on some occasions, he had to wait up to three days to receive his legal mail.

The plaintiff was not issued clothing. He was forced to wear the clothes of another inmate. He was not able to use the commissary because he was not issued an identification card. He complains that the showers and toilets at SCI–Graterford are not designed to accommodate inmates with disabilities. The sinks overlap the toilets. This prevents an inmate from sitting up straight. As a result, the plaintiff must sit bent over, which causes him "severe discomfort". Because of the showers' non-accommodating design, on one occasion, the plaintiff slipped and fell down.

The plaintiff alleges that all defendants have violated his rights to equal protection, due process and to be free from cruel and unusual punishment. He claims that each defendant is aware of the conditions he complains of because he has informed each defendant of these conditions.

## II.

■ In objecting to Judge Welsh's Report and Recommendation, Horn and Vaughn argue first that Saunders has failed to state a claim against them under § 1983 because he has not alleged that they were personally involved in the alleged wrongdoing. Personal involvement may be established through allegations of actual knowledge and acquiescence. *See Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir.1988). Saunders' complaint states that he wrote to defendants Horn and Vaughn after he received no response through the state prisoner grievance procedure, and that he received no response. Judge Welsh concluded that

> Based on this allegation and on the fact that defendants Horn and Vaughn are the superiors of the other named defendants, one could reasonably infer that defendants Horn and Vaughn acquiesced in the acts which caused the conditions the plaintiff

complains of. This is sufficient to plead personal involvement ...

Report and Recommendation at 5–6.

In challenging Judge Welsh's conclusion, Horn and Vaughn point to *Durmer v. O'Carroll,* 991 F.2d 64 (3d Cir.1993), a § 1983 case in which the Third Circuit approved the grant of summary judgment in favor of a state commissioner of corrections and a prison warden accused of deliberate indifference to the plaintiff's serious medical needs. In that case, "[t]he only allegation against either of these two defendants was that they failed to respond to letters Durmer sent to them explaining his predicament." *Id.* at 69. The court noted that "Respondeat superior is, of course, not an acceptable basis for liability under § 1983." *Id.* at 69 n. 14. It went on to conclude that

> Neither of these defendants ... is a physician, and neither can be considered deliberately indifferent simply because they failed to respond directly to the medical complaints of a prisoner who was already being treated by the prison doctor.

*Id.* at 69.

■ I do not read *Durmer* as standing for the proposition that "the failure of highly-ranked prison officials (who otherwise have no personal involvement in the matter) to answer an inmate's complaints regarding his medical treatment fails to give rise to Section 1983 liability," as defendants argue. The court specifically noted that plaintiff in that case was under the care of the prison's doctor, and reasoned that the officials had no basis for disagreeing with the doctor's treatment. Thus, *Durmer* seems to mean that high-level officials cannot be held liable for Eighth Amendment violations when the officials rely on expertise of professional staff that they themselves lack.

■ Saunders' complaint does not state which grievances he wrote to defendants Horn and Vaughn about, nor whether he was under the care of the prison doctor at the time he wrote to Horn and Vaughn. However, one reasonable chain of inferences that can be drawn from Saunders' complaint is that a Camp Hill officer discarded his doctor-prescribed orthopedic shoes and cane, that

he did not obtain treatment from an SCI–Graterford doctor, that the standard-issue shoes he was required to wear caused him constant pain, that Saunders wrote to Horn and Vaughn about his difficulties, and that Horn and Vaughn acquiesced in the failure to address Saunders' medical condition. Horn and Vaughn's motion to dismiss the Eighth Amendment claim will therefore be denied.

### III.

Horn and Vaughn also argue that Saunders has failed to state a claim under the Americans with Disabilities Act, 42 U.S.C. § 12101–12213 ("ADA") because the ADA does not apply in the context of state prisons.

■ The ADA shares a common substantive core with the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797(b): both prohibit broad arrays of institutions that serve the public from discriminating against disabled individuals on the basis of disability.[2] Indeed, "[w]hether suit is filed under the Rehabilitation Act or under the Disabilities Act, the substantive standards for determining liability are the same." *McDonald v. Pennsylvania Department of Public Welfare*, 62 F.3d 92, 95 (3d Cir.1995).

■ Section 504 of the Rehabilitation Act applies not only to any program conducted by an executive agency of the federal government but to "any program or activity receiving Federal financial assistance," 29 U.S.C. § 794(a); the term "program or activity" is defined as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." 29 U.S.C. § 794(b)(1)(A). Title II of the ADA applies to the "services, programs, or activities" of any "public entity," 42 U.S.C. § 12132, without regard to whether such services, programs, or activi-

ties are federally funded; a "public entity" includes "any State or local government [and] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1). Thus, as a matter of syntax, the two statutes cover all aspects of state and local governance.[3] Accordingly, if it be the case that when Congress writes a statute in plain words those plain words are to be the paramount guides utilized by the courts in construing the statute—*see, e.g., United States v. Alvarez–Sanchez*, 511 U.S. 350, 356, 114 S.Ct. 1599, 1603, 128 L.Ed.2d 319 (1994) ("When interpreting a statute, we look first and foremost to its text."); *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992) ("In a statutory construction case, the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished.")—it would seem to follow that both the ADA and the Rehabilitation Act apply to state and local correctional facilities.

Relying on the statute's plain language, the Ninth Circuit has held that the Rehabilitation Act protects state prison inmates from disability-based discrimination in the administration of programs for inmates of correctional facilities. In *Bonner v. Lewis*, 857 F.2d 559 (9th Cir.1988), a deaf inmate sued prison officials, asserting that the prison was obligated under the Rehabilitation Act to provide a qualified sign language interpreter in various prison settings, including counseling sessions and prison administrative hearings. Prison officials argued that the Rehabilitation Act did not protect inmates from disability discrimination because "inmates are hardly in need of help to live indepen-

**2.** Section 504 of the Rehabilitation Act provides:

> No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(a).

Title II of the ADA provides:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

**3.** The Rehabilitation Act applies, however, only to a "program or activity receiving Federal financial assistance."

dently within their prisons." *Id.* at 562. The Ninth Circuit disagreed:

> First, . . . the plain language of the Justice Department's implementing regulations, 28 C.F.R. § 42.503, and the Act itself, which states that it applies to "*any* program or activity receiving Federal financial assistance," 29 U.S.C. § 794 (emphasis added) belies [prison officials'] argument. Second, the Act's goals of independent living and vocational rehabilitation should in fact mirror the goals of prison officials as they attempt to rehabilitate prisoners and prepare them to lead productive lives once their sentences are complete. By ensuring that inmates have meaningful access to prison activities, such as disciplinary proceedings and counseling, the goals of both the institution and the Rehabilitation Act are served.

*Id.*

Notwithstanding the unambiguous language of the disability statutes, the Tenth Circuit has held that the Rehabilitation Act and the ADA do not apply to at least certain claims arising in the correctional context. The Tenth Circuit's starting point was *Williams v. Meese*, 926 F.2d 994, 997 (10th Cir.1991). The court there held that the Rehabilitation Act does not apply to employment discrimination claims challenging certain aspects of programs involving the employment of federal prison inmates. The court stated: "The section of the Rehabilitation Act cited by the plaintiff [section 504], does not give plaintiff any substantive rights since the Federal Bureau of Prisons does not fit the definition of 'programs or activities' governed by that section." In *White v. Colo-*rado, 82 F.3d 364 (10th Cir.1996), the holding in *Williams* was extended to an employment discrimination claim brought by a state prisoner pursuant to the ADA: "For the same reasoning relied upon in *Williams*, we hold that the ADA does not apply to prison employment situations either." *Id.* at 367.[4]

Two other circuit courts have voiced an opinion on the applicability of the ADA to prisons, albeit without expressly ruling on the question. In *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir.1996), the Court of Appeals for the Seventh Circuit held that the ADA did not provide a cause of action to a disabled state prisoner to challenge the prison's failure to provide guardrails to his bed. The court concluded that no discrimination occurred because the inmate did not allege that he had been excluded from any prison "service," "program," or "activity." In so holding, the court expressed some doubt as to the applicability of the ADA to correctional facilities: "Could Congress really have intended disabled prisoners to be mainstreamed into an already highly restricted prison society?" Without pointing to any evidence of congressional intent which might indicate one way or another the answer to this question, the court opined that "[j]udge-made exceptions . . . to laws of general applicability are justified to avoid absurdity." *Id.* at 248–49.

In *Torcasio v. Murray*, 57 F.3d 1340 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996), the Court of Appeals for the Fourth Circuit strongly intimated that the Rehabilitation Act and the ADA do not apply to state prisons.[5] The

---

4. *Williams* may be read as holding that the Rehabilitation Act does not apply to prisons generally, or it may be limited to federal prisons; alternatively, it may be limited to employment discrimination claims brought by prisoners. Uncertainty as to the scope of the holding is due to the fact that the sentence from *Williams* quoted in the text is the only analysis in the opinion devoted to the question of the applicability of the Rehabilitation Act. Apart from the fact that *White* deals with a state prison rather than a federal prison, *White* does not clarify matters, as the sentence quoted above from that case is its only analysis of the applicability of the ADA.

5. Subsequent to *Torcasio*, two district courts in the Fourth Circuit have held that the ADA does not apply to certain claims brought by prisoners. Relying primarily on *Torcasio*, the court in *Pierce v. King*, 918 F.Supp. 932, 938 (E.D.N.C.1996) held "that the Americans with Disabilities Act does not create a cause of action for state inmates displeased with their prison work assignments." In addition, the court in *Pierce* also found that prison labor does not substantially affect interstate commerce and that, following *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), Congress lacks authority under the Commerce Clause to apply the ADA to prisons. Relying entirely on the rationale of *Torcasio*, the court in *Staples v. Virginia Dept. of Corrections*, 904 F.Supp. 487, 490

actual holding in *Torcasio* was that, at the time of the alleged discrimination, it was not clearly established that the ADA and the Rehabilitation Act apply to state prisons, and, consequently, the defendant prison officials were entitled to qualified immunity under these statutes.[6] The *Torcasio* court's primary reason for doubting that the statutes cover prisons was that the statutes, although seeming to speak in comprehensive terms— "all the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government," 29 U.S.C. § 794(b)(1)(A) (Rehabilitation Act); "any department, agency, special purpose district, or other instrumentality of a State ... or local government," 42 U.S.C. § 12131(1) (ADA)—do not expressly recite that prisons are among the "all" or "any" entities covered. The Fourth Circuit stated: "Because the management of state prisons implicates 'decision[s] of the most fundamental sort for a sovereign entity,' Congress must speak unequivocally before we will conclude that it has 'clearly' subjected state prisons to its enactments." 57 F.3d at 1346 (citation omitted). In support of its view that the statutory provisions do not speak sufficiently "clearly," the court quoted from *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 65, 109 S.Ct. 2304, 2309, 105 L.Ed.2d 45 (1989), in which the Supreme Court, quoting an earlier pronouncement in *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 242, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985), observed that "if Congress intends to alter the 'usual constitutional balance between the States and the Federal Government,' it must make its intention to do so 'unmistakably clear in the language of the statute.' "

It of course must be acknowledged that the management of prisons is a state (or local) responsibility of great importance. But the management of police and firefighting forces, the management of child protection services, and the management of the court system are also state (or local) responsibilities of great importance, and all of these functions are routinely understood to be covered by the Rehabilitation Act and the ADA notwithstanding that these functions are not expressly referred to in either of the statutes. *See Thomlison v. City of Omaha*, 63 F.3d 786 (8th Cir.1995) (affirming the denial of summary judgment in a Rehabilitation Act claim brought by a firefighter); *Doe v. Judicial Nominating Commission*, 906 F.Supp. 1534 (S.D.Fla.1995) (holding that the process for judicial nominations must comply with the ADA); *Clark v. Virginia Board of Bar Examiners*, 880 F.Supp. 430 (E.D.Va.1995) (holding that requiring state bar applicants to answer questions regarding psychotherapy violates the ADA); *Eric L. v. Bird*, 848 F.Supp. 303 (D.N.H.1994) (holding that the plaintiffs had stated an ADA claim in alleging that the state provided foster care services that discriminated on the basis of disability); *Ethridge · v. Alabama*, 847 F.Supp. 903 (M.D.Ala.1993) (denying summary judgment in an ADA case brought by a disabled police officer); *Galloway v. Superior Court of the District of Columbia*, 816 F.Supp. 12 (D.D.C. 1993) (holding that the categorical exclusion of blind people from juries violates the ADA).

More to the point, it is not apparent that the so-called "clear-statement" cases, of which *Will* is a recent example, have been intended by the Supreme Court to provide a canon of statutory interpretation which can be of help in interpreting statutes whose

---

(E.D.Va.1995) held that "the ADA [is] inapplicable in the state prison context."

**6.** In reliance on *Torcasio*, one district court in this circuit has also held, in the context of qualified immunity, that it is not "clearly established" that the Rehabilitation Act applies to correctional facilities. *Little v. Lycoming County*, 912 F.Supp. 809, 819 (M.D.Pa.1996), aff'd 101 F.3d 691 (3d Cir.1996) (mem.). *But see Austin v. Pennsylvania Dept. of Corrections*, 876 F.Supp. 1437, 1465 n. 17 (E.D.Pa.1995) ("[T]he Rehabilitation Act applies with the same force and effect in correc-

tions institutions as it does in other federally-funded programs.").

Several other district courts have recently rejected the approach of *Torcasio*. *See Kaufman v. Carter*, 952 F.Supp. 520, 528–29 (W.D.Mich. 1996); *Armstrong v. Wilson*, 942 F.Supp. 1252, 1258–59 (N.D.Cal.1996); *Niece v. Fitzner*, 941 F.Supp. 1497, 1505 (E.D.Mich.1996); *see also Fennell v. Simmons*, 951 F.Supp. 706, 713 (N.D.Ohio 1997) (holding that the ADA applies to county jails). *But see Crawford v. Indiana Dept. of Correction*, 937 F.Supp. 785, 791 (N.D.Ind. 1996).

over-all design indisputably contemplates both that the policies and practices of state (as well as local) governments are required to conform to norms established by Congress and that the remedies include the bringing of a lawsuit in the federal courts. Quite the contrary: the Court seems to have made it plain that the clear-statement requirement is to be resorted to in those instances in which the text of a federal statute furnishes little real guidance as to whether Congress intended to subject state agencies to potential liability. For instance, in *EEOC v. Wyoming,* 460 U.S. 226, 243 n. 18, 103 S.Ct. 1054, 1064 n. 18, 75 L.Ed.2d 18 (1983), in which the Court examined amendments to the Age Discrimination in Employment Act (ADEA), the Court stated that the clear-statement rule was "a tool with which to divine the meaning of otherwise ambiguous statutory intent." The Court found, however, that the rule offered no guidance on the question raised by the case because "there is no doubt what the intent of Congress was: to extend the application of the ADEA to the States." *Id.* In *Gregory v. Ashcroft,* 501 U.S. 452, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), the Court examined whether a statutory exemption to the ADEA for "appointee[s] on the policymaking level" included state-court judges. Finding the language of the exemption ambiguous, the Court applied the clear-statement rule and held that, because Congress had not specifically excluded state-court judges from the exemption, state-court judges would be considered to be included in the exempted category. As it had stated in *EEOC v. Wyoming,* the Court in *Gregory v. Ashcroft* described the clear-statement rule as "a rule of statutory construction to be applied where statutory intent is ambiguous." *Id.* at 470, 111 S.Ct. at 2406.

*Will* appears to illustrate aptly the scope and limits of the "clear-statement" rule. In that case, which arose in a Michigan state court, Ray Will, a state employee, sued Michigan's Department of State Police and Director of State Police. The gravamen of Will's suit was that the defendants had denied the plaintiff a promotion because of his brother's radical political views, a denial alleged to contravene plaintiff's federal and state constitutional rights. In seeking vindication of his federal constitutional claims, Will relied on § 1983, the statute which underpins so much federal civil rights litigation, including the case at bar. Section 1983, which derives from the Civil Rights Act of 1871, provides that "[e]very person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects ... any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution ... shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." The Michigan Supreme Court concluded that Will's federal claims were not cognizable for the reason that neither a state nor a state official acting in an official capacity is a "person" within the meaning of section 1983.

The United States Supreme Court affirmed. Prior to *Will,* which was decided in 1989, the Court had held, in 1978, in *Monell v. New York City Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), that a municipality is a suable "person" within the meaning of section 1983. But in *Will* the Court declined to read "person" so broadly as to include the several states. The Court noted that the construction of section 1983 contended for by Will would, in effect, rewrite the statute in the form "every person, including a State, who under color of any statute ... subjects," and that this "would be a decidedly awkward way of expressing an intent to subject the States to liability." 491 U.S. at 64, 109 S.Ct. at 2308. Cutting strongly against this "awkward" construction that would have made a state suable under section 1983 both in federal courts and in the state's own courts was the fact that in 1979, just a year after *Monell,* the Court had ruled, in *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), that, by virtue of the Eleventh Amendment's grant to the states of immunity from suit in the federal courts, a federal

district court was without jurisdiction to entertain a section 1983 suit seeking to recover money damages from a state. While recognizing that Congress has the authority, in the exercise of certain of its constitutional powers, to enact legislation overcoming the states' Eleventh Amendment immunity, the Court in *Quern* found that "§ 1983 does not explicitly and by clear language indicate on its face an intent to sweep away the immunity of the States; nor does it have a history which focuses directly on the question of state liability and which shows that Congress considered and firmly decided to abrogate the Eleventh Amendment immunity of the States." 440 U.S. at 345, 99 S.Ct. at 1147.

In *Will*, the Court built upon *Quern v. Jordan*. Having held in *Quern v. Jordan* that Congress, in 1871, in enacting section 1983, had "not explicitly and by clear language" evidenced an intent to override the states' Eleventh Amendment immunity, the Court in *Will* held that, in utilizing the all-purpose but hardly self-defining word "person" in section 1983, Congress had not evidenced an intent to take the major step of bringing state governments as well as local governments within what was in 1871 an unprecedented federal supervisory regime.

In marked contrast with § 1983, the Rehabilitation Act and the ADA both speak expressly of state governments and "any" or "all" of the operations thereof. Also, in marked contrast with § 1983, both the Rehabilitation Act and the ADA expressly abrogate the Eleventh Amendment immunity of the states.[7] Against that background, it

would not seem a proper exercise of the judicial function to require Congress to specify each of the important components of state governments that comprise Congress's use of the words "any" and "all."

The Fourth Circuit, in *Torcasio*, supplemented its clear-statement analysis by finding that some of the statutory language did not lead comfortably to prison-based claims. Specifically, the court pointed to 42 U.S.C. § 12131(2), in which the ADA defines a "qualified individual with a disability" as a person who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities." According to the Fourth Circuit, correctional facilities do not provide "services," "programs," or "activities," as those terms are ordinarily understood. Furthermore, the court concluded that "[t]he terms 'eligible' and 'participate' imply voluntariness on the part of an applicant who seeks a benefit from the state; they do not bring to mind prisoners who are being held against their will." 57 F.3d at 1347. It would be anomalous to follow the Fourth Circuit's suggestion in *Torcasio* that the Rehabilitation Act and the ADA are inapplicable to programs and services that are obligatory in nature. Such a limitation would appear to immunize disability-based discrimination in the provision of such compulsory services as public education, jury service, and mandatory inoculations. Nothing in the texts of the ADA and the Rehabilitation Act hints at such a result.

I therefore conclude that the ADA applies to state prisons.[8]

7. In *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), in which a rejected applicant for employment with a state hospital sued the hospital for disability-based discrimination, the Court held that the Rehabilitation Act did not satisfy the clear-statement rule and therefore did not abrogate state sovereign immunity. In response, Congress enacted 42 U.S.C. § 2000d–7, providing: "A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act." In enact-ing the ADA, Congress similarly abrogated state sovereign immunity: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." 42 U.S.C. § 12202.

8. The same analysis leads to the same conclusion with respect to the Rehabilitation Act; but in the case at bar plaintiff's statutory claim is based on the ADA and not the Rehabilitation Act, so this opinion's formal holding is confined to the ADA.

## IV.

In conclusion, Judge Welsh's Report and Recommendation is approved in its entirety.[9]

---

**9.** Horn and Vaughn also object to Judge Welsh's treatment of their motion to dismiss Saunders' procedural due process claim. The defendants raise no arguments that were not before Judge Welsh, however. I accept and adopt Judge Welsh's treatment of this issue. I also accept and adopt Judge Welsh's treatment of defendants' argument that Saunders fails to allege facts establishing that the defendants violated the ADA.